ALEXANDER A. BUCKNER et al. *v.* STANLEY JONES et al.

[No. 20, October Term, 1930.]

680

Decided December 5th, 1930.

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*David Ash,* with whom was *Louis Hollander* on the brief, for the appellants.

*Edwin T. Dickerson* and *Leon Kappelman,* with whom was *Samuel H. Hoffberger* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

In 1919 Stanley Jones and Eliza, his wife, colored, were living in Baltimore. Stanley, who was employed as a truck driver by the Baltimore & Ohio Railroad Company, was also a minister of the gospel, and to augment his earnings occasionally conducted religious services as time and occasion permitted, and Eliza, his wife, contributed to the family exchequer her earnings as a domestic servant. They were a simple, unsophisticated, couple, absorbed in their own small problems and ambitions and wholly unconscious of any necessity for caution in dealing with strangers in business affairs. Stanley, although he was a minister of the gospel, had no church in which to preach it, and one of their ambitions was to secure some building in which he might conduct religious services, and in furtherance of that hope they were looking for a house which could be used both as a church and a dwelling. With that end in mind, on March

5th, 1919, at the suggestion of John Edwards, a member and a deacon *pro tem.* of Stanley's congregation, Stanley approached Louis Buckner, a real estate operator who owned a number of houses in Baltimore City, to learn whether he had such a house as they wanted. Buckner had for many years been engaged in buying, selling, and dealing in real estate, apparently as his principal occupation, and the impression left by his testimony is that he is a shrewd, capable, and experienced business man, thoroughly familiar with the technique of the real estate business. As a result of his interview with Buckner, Jones and his wife occupied a house known as No. 405 South Bond Street in Baltimore City, which was subject to a ground rent of $30.37, and which had been purchased for $2,500 in 1918 and conveyed to Louis Buckner's son, Alexander A. Buckner, and Elsya, his wife, and which at the time of the interview stood in their names, as indeed it still does.

The terms upon which they occupied the property constitute the issue in this case. Jones and his wife, the appellants, assert that they entered it under a parol agreement of purchase which provided that it was to be sold to them for $5,000, payable in monthly instalments, and that upon the payment of that sum with accrued interest, taxes, and other incidental expenses, it would be granted to them by a proper conveyance. Buckner's contention, on the other hand, appears to be that they occupied the property as mere monthly tenants, and that he never at any time, either for himself or for his son and daughter-in-law, contracted to sell it .to them. But whether as tenants or as purchasers, from the time they entered the property in March, 1919, until some time in 1926, Jones and his wife did make monthly payments to the Buckners aggregating, according to their testimony, over $7,000, and according to the appellants' testimony, $5,982.30.

In September, 1926, Jones apparently began to be uneasy about his interest and title to the property, in which he had invested his earnings for so long, and a paper which Louis

Buckner presented to him at or about that time, to be signed by himself and his wife, confirmed his fears and suspicions. That paper was in the form of a contract for the purchase of the property for $8,000. Jones, to quote from his testimony, "didn't see nothing that belonged to" him on that paper, and when Buckner said that it was all right, he said, "No, sir, it is all right for you but I don't see nothing on there for me," and refused to sign it. After that interview, since the appellants definitely refused to recognize any contract for the sale of the property to appellees, they made no further payments on it, and in October, 1926, they filed the original bill of complaint in this case against Alexander A. Buckner and Elsya, his wife, in Circuit Court No. 2 of Baltimore City. The defendants answered that bill, the case was referred to an auditor for accounting, the parties adduced evidence before the auditor supporting their respective contentions, and the auditor reported to the court that he had found that the complainants had made payments on account of the property aggregating, above all allowances and deductions, $5,337.34. The case was then heard on bill, answer and testimony before the chancellor, who decreed that the defendants had made a valid and enforceable contract for the sale of the property to the complainants, but, inasmuch as the auditor had failed to compute interest on the deferred payments, the case was again referred to him for such computation. On February 2nd, 1928, the auditor filed a supplemental account, showing that the complainants had made payments on account of the property aggregating in amount, over all allowances and deductions, including interest on deferred payments, $4,585.62. Exceptions to that account were filed, but were never passed upon except in so far as they were involved in the issues decided at the final hearing of the case. On October 24th, 1928, the complainants, upon their petition, alleging that Louis Buckner was the actual owner of the property at the time the supposed contract for its sale to Stanley and Eliza Jones was made, and that Alexander A. Buckner and Elsya, his wife, were mere nomi-

nal owners, were permitted to amend their bill by making Louis Buckner a party defendant. Louis Buckner filed a motion *ne recipiatur* to the petition, and the original defendants demurred to the amended bill. Both the motion and the demurrer were overruled and those orders were affirmed on appeal to this court (*Buckner v. Jones,* 157 Md. 239), and the cause remanded for further proceedings. *Ibid.* Upon its remand it came on for hearing before the chancellor then presiding in Circuit Court No. 2 of Baltimore City, testimony was taken before him, the case was heard, and at the conclusion of the hearing he decreed that the defendants convey to the complainants the Bond Street property subject to the ground rent of $30.37, but otherwise free from all liens except state and city taxes and water rent, "upon payment by the plaintiffs to the defendants of the sum of $420.83, as set forth in the auditor's supplemental report filed herein, as corrected by readjustment of interest, said amount being the balance due the defendants by the plaintiffs, on account of the purchase price of the premises No. 405 S. Bond Street, herein mentioned as per the said agreement herein specifically enforced, the defendants having been allowed interest, expenses and expenditures in said auditor's supplemental report." This appeal is from that decree.

The principal question submitted by it is whether the appellants did in March, 1919, enter into a valid and enforceable contract for the sale of the Bond Street house to Stanley and Eliza Jones. Subsidiary to that are the further questions: (1) What part of the purchase price remains unpaid? and (2) Did the determination of that question by the chancellor involve the consideration of evidence taken before Louis Buckner was formally a party to the cause? These questions will be considered in the order in which they have been stated.

The first question is purely one of fact and its determination largely turns upon the weight to be given the testimony of the parties themselves. If, as the appellees alleged, the appellants agreed orally to sell them the property for $5,000, payable in monthly instalments, and they, the appellees, ac-

tually paid on account of the purchase price over $4,500, and were ready, willing, and able to complete the payments, then the appellants did enter into a valid contract for the sale of the property to Jones and his wife, which a court of equity will specifically enforce. *Buckner v. Jones, supra.*

In support of their version of the transaction, the appellees offered the testimony of Stanley Jones, Eliza Jones, and John Edwards, while Louis Buckner, his wife, Mrs. Frances Buckner, and his son, Alexander A. Buckner, testified to the contrary. The only other witnesses were Charles Greenblatt, a real estate expert offered by the appellees, who testified that the value of the property in November, 1927, was about $3,500, and these witnesses for appellees, Israel Silberstein and Mrs. Elizabeth Tarum, whose testimony was wholly immaterial and may be disregarded, and Edward Geisler, who testified that in the seven years preceding 1926 he had on several occasions made repairs to the Bond Street property for Louis Buckner. So that the material witnesses form two groups, one composed of Stanley and Eliza Jones, interested witnesses and parties to the cause, and John Edwards, their friend, the other composed of Louis and Alexander A. Buckner, both interested parties to the cause, and Mrs. Frances Buckner, the wife of Louis Buckner. Considering the numerical equality of the two groups in valuing their testimony, consideration should be given not only to the significance and effect of the facts to which they testified, but to the opportunities open to the respective witnesses of knowledge of them, as well as to the inherent probability of such facts, in view of the situation of the parties, and all other relevant circumstances.

In other words, when two witnesses or numerically equal groups of witnesses equally credible give conflicting versions of the same occurrence, the truth of their respective statements, if it is to be decided at all, can only be decided by testing the probable truth of the facts to which they respectively testify by the dictates of common sense, guided by the ordinary experience of men in their relations with each other, and while there are no legal rules for determining the weight

of testimony, it naturally takes less testimony to support allegations of fact or conditions which are reasonable and consistent with common knowledge and experience, than where such facts or conditions are unreasonable, improbable, and contrary to the known habits and conduct of men in the ordinary affairs of life. And in valuing the testimony of the witnesses in this case, some effect must be given to its probable truth, when considered in connection with the relative situation and resources of the parties, their experience and apparent intelligence, and the purposes which respectively they were trying to accomplish.

Turning to the facts, it appears that the only persons present at the time Louis Buckner and the appellees agreed upon the terms upon which the latter were to occupy the property were Louis Buckner, John Edwards, and Stanley Jones. Stanley Jones testified that on March 5th, 1919, he and Edwards saw Louis Buckner at his home on Baltimore Street, and asked him if he had any houses, and that Buckner said he had, and took them to the Bond Street property, and that they went through an apartment on the second floor of the house occupied at the time by Alexander A. Buckner and his wife, and that Louis Buckner told his daughter-in-law, who was there at the time, that he was going to sell the house, and she said that it was all right; that after that they returned to Buckner's home, where the following conversation took place: "Q. Did you say anything to Mr. Buckner about buying a house for the church on that occasion? A. We did. Q. What did you say to him and what did he say to you? A. We asked him did he have any houses and he said 'Yes.' And then he takened us to the corner of Broadway and Baltimore Street. So we told him that that would not suit us and then he carried us from there down to 405 South Bond Street. Q. Did you go in the house at 405 South Bond Street with Mr. Buckner? A. We went in the second floor. Q. Did you see Mrs. Louis (obviously intended for Alexander) Buckner, one of the defendants in this case? A. She was on the second floor, ironing. Q. Ironing? A. Yes, sir. Q. What, if anything, did Mr. Buckner say to her on that occasion

about selling the house? A. He told her that he was going to sell it. Q. What did she say? A. She said it was all right. * * * Q. Was there any conversation between you and Mr. Buckner after you went back to his house, about selling the Bond Street property? A. Yes, sir. Q. What was that conversation? A. He wanted five thousand dollars for it, but Edwards told him that he didn't have that much money. He said, 'What you got?' He said, 'I have got twelve and a half.' He said 'Get me that then.' So we had to go on home to get it, and when we came back he said, 'Well, we will take the twelve and a half and you pay me twelve and a half weekly until, well, after three months, one hundred and fifty dollars would be deposited?' Q. Yes? A. When we came back he said, 'Now, I told you that fifty dollars, but fifty dollars would not cover the expenses on the place, so after three months is out, you pay seventy-five dollars, in order to cover the expenses.' Q. Did he tell you what the taxes and the ground rent were? A. One hundred dollars for the taxes and thirty dollars for the ground rent. Q. Well, now, did you agree to take the house on those terms? A. Yes, sir. Q. Who was buying the house? You or your wife and you? A. I and my wife."

John Edward's recollection of the interview with Buckner as to the terms upon which the Jones's were to occupy the property varied somewhat from that of Jones. His testimony as to that was in substance as follows: "Q. My question is, Did you go with Reverend Jones to see Mr. Louis Buckner about the Bond Street property some years ago? A. Yes, sir. * * * Q. * * * You both saw Mr. Louis Buckner on that occasion? A. Yes, sir. Q. All right. Now, what took place? What happened? What did you say to him and what did he say to you when you and he were there together? A. He said, 'Well, you have come to see me.' I said, 'Yes.' 'You have come to get a house,' he said. I told him yes. He said 'All right.' All I want then is the money, so we will go down to see about this house. * * * Q. Were there any people living in there when you went down there? A. Yes, sir. Q. Did you see Mr. Al's wife? A. Yes, sir. Q. What was she doing?

A. She was ironing. Q. Now, did Mr. Louis Buckner say anything to her about selling that house? A. Yes, sir. And she told him to go ahead and to do what he wanted. Q. Well. first, what did he tell her? A. Why, he told her that he was going to sell the house. Q. Yes. And then she said what? A. She said for him to go ahead and to suit himself. * * * After we got through we went back up to Mr. Buckner's house again, yes, sir. Q. Yes. Now, was anything said at Mr. Buckner's house about the price on this property? A. Sir? Q. Was anything said at Mr. Louis Buckner's house between you all about the price that was to be paid for this Bond Street house? When you got back up there, I mean? A. Not in Mr. Buckner's house we didn't say anything about the price, no, sir. But we said outdoors. Q. Outdoors? A. Yes, sir. Q. All right. What did Mr. Buckner say to you outdoors about it then? A. Well, Mr. Buckner said that he would sell him the house for five thousand dollars. Q. How much? A. Five thousand dollars. * * * Q. Did he tell you how much the ground rent was, if he did tell you anything at all about it? A. He said that it was one hundred dollars for one, I don't know which just now, whether it was the ground rent or the taxes. Q. Yes. And how much for the other? A. One was thirty and one was a hundred. Q. But you don't know whether that hundred dollars was taxes or ground rent or the reverse, do you? A. No. sir. Q. Now I ask you, John, what if anything was said by Mr. Louis Buckner to the Reverend Jones about the payments that he was to make on that house. A Well, he said that he wanted one hundred and fifty dollars down and we told him that we didn't have that much money with us. We didn't have it at all. So he says to me, 'Aw, let's go on home.' Then he said, 'Well, how much money have you got?' We told him that we didn't have but twelve dollars and he said, 'Well, give me the twelve dollars and we will fix it so that you can make the payments by paying me twenty-five dollars on each payment.' "

The testimony of Louis Buckner as to the transaction was quite different. He said: "Mr. Jones, and the old gentleman sitting over there with him (apparently referring to Edwards), came to my former home at 1630 East Baltimore

Street to rent the piece of property at Number 405 South Bond Street. He asked me the rental of it and I told him seventy-five dollars a month. He says that would be more than he can spare for any piece of property. And he wanted to use it for a church downstairs and a dwelling upstairs. He said that he could not afford to pay that price. * * * And he looked at the houses and he said that it would be an accommodating proposition to him if he could get that house. * * * 405 South Bond Street. * * * As it is room there that he could rent out and so make his rental be as low as the rental that would be at the corner of Eastern Avenue and Caroline Street. Then he said, then he asked me if I would sell him this property. * * * And so I said, 'Yes.' He said, 'What do you want for it?' I told him I would take five thousand dollars for it. And he said, 'Well, if this would be three months later I no doubt could avail myself of buying it.' I said, 'Well, three months later would make so much difference.' He said, 'Well, he would have time to go to different institutions and apply for help from them to help him to buy this particular piece of property.' So then I said, 'How much rent can you afford to pay? If I gave it to you for a little less money conditional that you would pay it in three months at a little increase, could you do it? Well, I don't recollect what his answer to that was. But he agreed to pay me fifty dollars a month for three months at the rate of fifty dollars a month. And then at the end of that time, after the third month, if he did not succeed in buying he would obligate himself to pay seventy-five dollars a month. I asked him how he could do it then and not now, and he said, 'Well, it may take me a little time to rent out a part of the house but I think I will succeed,' he said. So we closed up the matter there by renting him the house in question at fifty dollars a month for three months."

He further testified that at the expiration of the three months he went to Jones and told him that the "time was up," and that he would "like for him to begin to start in with the seventy-five dollars a month," but that Jones said he had not been able to get any assistance from the churches, and had only been able to rent one room. That he then com-

plained to Jones that he (Jones) was not paying "even the little that he had bargained for," and that the witness did not think that he would be able to pay seventy-five dollars a month, but that the witness proposed to rent Jones a part of the house, reserving to himself possession of the other part of it, and that he did rent a part of it to Jones at $14 a week, that later Jones' stepdaughter occupied the property and for that he added $3 a week to the $14, and that he added $1.25 for an additional room that Jones took, and that finally he, Buckner, rented four rooms in the house and collected $4 weekly for them. So that, according to his statement, as a result of these several transactions Buckner was receiving $22.25 a week for property which he stated that he had at first rented to Jones for $12.50 a week, and of that sum Jones was paying $18.25 for a part of the property, when he had under the original arrangement, described by Buckner, paid $12.50 a week for the whole of it. The witness further testified that the Joneses had objected to tenants to whom Buckner had rented a part of the house at $4 a week, that he got rid of those tenants, and that the Joneses paid him the rent those tenants had paid in addition to what they were already paying, but that later, when Jones complained of the amount of rent he was paying, Buckner without any demur reduced it to $75 a month. Further testifying, the witness said that after a couple of years Jones began to fall behind in his payments, and that in 1926 Jones surprised him by telling him that he has been offered the adjoining property at $7,000, payable on the instalment plan; that witness advised Jones not to buy the property but that he said to him, "Jones, I will tell you what you do. You may have a little more encouragement to go ahead and pay for it if you own a piece of property, so I will sell you this piece of property and give you a receipt for the thirty dollars on the purchase. So then we figured up his book and it came to one thousand and six dollars. So I said to him, "We will make you a present of that six dollars and we will count the thousand only. Now, how will you manage to pay that thousand dollars?" He said: "Well, we will figure it up in the purchase of the property. If I have to go out and get some money for the purchase of

the property they will see that it is worth more than eight thousand dollars." And so then we agreed upon the eight thousand dollars instead of seven. After that I went to my attorney and I explained to him the transaction what I made to Jones. I told him about the piece of property and how the rent was agreed to figure in the purchase price, so that he would know how to write the agreement according to our arrangements with Jones"; that he took the agreement which he had had prepared to Jones, that hearing nothing further from him in reference to it he went to his home to see him; that when he arrived he found Jones and John Edwards there; that he spoke to Jones about the agreement and Edwards said: "I was there when the piece of property was rented and I know, he says, that you made the arrangement. You were asked for the price and you said it was five thousand dollars for it if we wanted to buy it. He said, 'Now, I am told that the agreement is for eight thousand dollars.' So then I said, What has that got to do with the agreement? I only wanted to know whether the agreement is drawn properly or not. That is the reason that I brought it up here. I didn't want to hurry for Mr. Jones to acknowledge it before the notary before the note and the contract was fixed up. So then one word brought on another and I did have a few loud words with him, with the old gentleman about it"; that Jones on the following day came to his (Buckner's) home and said that he was willing to sign the agreement if Buckner would agree not to "throw him out" in case of default, and witness then said to Jones: "You can have confidence in me that I will not put you out if you don't be able to pay up or sickness may happen. In that case I will take care of you as I did before. Well, he said, life is uncertain. You can't tell what may happen to you and your children won't treat me as well as you have been treating me. You have been a father to me"; that at a subsequent interview Jones flatly refused to sign the agreement and that witness then instituted proceedings in the People's Court to dispossess him. The agreement referred to by Buckner provided for the purchase of the property for $8,000, payable in monthly instalments of $75, and was in all respects similar to the parol

agreement of 1919 described by Jones and Edwards, except that the price was $8,000.

In corroboration of appellants' testimony that the property was originally rented and not sold to appellees, Mrs. Frances Buckner, to whom many of the instalments were paid, testified that "whenever" those instalments were paid to her, the payment was accompanied by the statement that it was for "rent"; she further testified that on the occasion in 1926, when Jones and his wife came to Buckner's home to discuss the agreement which he asked them to sign, Buckner told her in their presence that he had sold the property to them for $7,000, plus $1,000 for "back rent," that they did not deny it, and she, Mrs. Buckner, congratulated them on the purchase and wished them luck, and that "Mrs. Jones" seemed "very happy."

Alexander A. Buckner was also present "at the beginning of the bargaining" for the house, and his recollection of what occurred is expressed in the following extract from his testimony: "Q. All right. Now, go ahead with your story? A. Well, then, Reverend Jones and the old gentleman came in there and he said that seventy-five dollars a month would be too much money, for he could not stand that much expense right away. He was just opening a congregation that was moving there from Dallas Street, and he had to get his congregation built up first, but that if he could get some help from societies he would then be able to pay more money and buy the property. Q. Yes? A. But as it was, he said that he could only pay about fifty dollars a month. So Dad said to him, 'Well, how about making it for fifty dollars a month for three months, giving you an option that if you can raise the down payment on it, that you can buy it then.' So he went and paid twelve dollars and a half, at the rate of fifty dollars a month for the down payment, for one week's rent. * * * Q. Were you satisfied with fifty dollars a month? A. Well, we were getting a good tenant into the place and that satisfied us. Q. Did you think it was enough? A. No, sir. It was not enough for that property; no, sir. As the man whose money was in it I didn't think it was enough. * * * Q. All right. What did you tell him? A. I told him, I said, 'Dad,

it is just giving away the property for fifty dollars a month rent.' I said, 'seventy-five dollars is pretty cheap, but as long as we are going to get them for a tenant, all right, leave them have it for three months and it will be more money after that.' The fifty dollars only paid the expenses to the building association and paid a part of the Morris Plan. It just helped out a little on the Morris Plan."

Eliza Jones was not present when the original transaction between Jones and Buckner was consummated, but she testified, after she and her husband had moved into the house, Buckner came there and was introduced to her. She further testified that, when Buckner presented the blank agreement to her husband in 1926, she was present, and that the following conversation took place: "Well, Mr. Buckner walked in and he spoke to us and he sat down just like he always did. Then he said, 'Now, here, Brother Jones, here is this paper.' He said, 'Your day's work is too valuable for you to stop to go to sign this paper, but you can send it here with your wife and I will take it to the judge to have it signed myself.' I said, 'No, I ain't going to sign nothing like that, for they tell me when them deeds is signed the judge has got to sign it, and I ain't a fool on that. You will have to take it to the Court House.' And so then I wouldn't sign and the Reverend Jones wouldn't sign either"; that Buckner had previously spoken to Jones about the paper, and that Jones had told him that when Buckner brought it to him he would have a friend present; and to quote the witness: "So Reverend Jones notified his man to come there over at my home against Mr. Buckner coming and so then Mr. Buckner came in just a little before Brother Edwards did. He said, 'Where's your man?' Just like that. 'Where's your man?' Brother Jones looked out the window and he said, 'My man will be here.' But he didn't see him right at that time, but the next time he looked out of the window he said, 'There he comes now.' And just then Mr. Louis Buckner he looks out of the window his own self and he says, 'Is that your man?' Reverend Jones said 'Yes.' Q. All right? A. And then Reverend Jones, after telling Mr. Buckner that that was his man that was coming there then, then Brother Jones he looks around and Mr.

Buckner seen the man that it was Brother Edwards, and he says, 'Is that the man you are talking about?' He says, 'Yes, that is my man.' Then Mr. Louis Buckner he says, 'Why he don't know nothing. He is nothing but a damned dummy.' 'Brother Edwards,' he says, 'I know that you call me a damned dummy, but before it is done with I will make you out a damned dummy.' "

In connection with this testimony it may be noted that the undisputed evidence is that, when the appellees took possession of the property in 1919, it was out of repair, that it was in a deplorable filthy condition, and which is perhaps best described by Eliza Jones in this vivid and picturesque language:

"Q. * * * The store room. Was it clean and nice? A. Clean. Q. Yes? A. Well, it was seven loads of all kinds of trash and filth taken out of there. Old carcasses and bones of cows there. Mr. Buckner had a market there. He had three rooms downstairs just packed up high with papers and rotten meat. And it smelt so bad that you couldn't hardly stay there. And it was seven loads of trash and stuff and old paper that was in that house and that we had to have taken away from there. * * * I said, 'Mr. Buckner,' I said, 'this house is in a bad condition,' I said. 'Who is going to pay for all this stuff that has got to be hauled away?' He said, 'Oh, my. The Reverend has to do that. Just look what I am giving you. You see, this house here is five thousand dollars and you couldn't buy it no other part of Baltimore for that amount of money.' I said, 'Well, this is no extra house. It is just as dirty and smutty as anything can be.' He said, 'Well, the Reverend had to do all the payments for the moving but he would see that the cart came there to haul it away but that the Reverend Mr. Jones had to pay for it,' and he did. And the cart hauled those seven cart-loads of trash away from there. It hauled them away from there and Reverend Jones had to pay for it, but I don't know how much it was that he paid for it."

We entirely agree with the conclusion of the chancellor who considered this case, that this testimony is sufficient to prove that appellees entered into possession of appellants'

property under a parol agreement of purchase, that the agreement was definite and precise as to terms, parties, and subject matter, fair and mutual and based upon a valuable consideration, that the appellees partly performed it, and were ready, able and willing to complete their performance of it. Buckner's version of the transaction between him and the appellees is not only highly improbable, but finds little support in the evidence offered on behalf of appellants. Mrs. Buckner knew nothing of the original transaction, the testimony of Alexander A. Buckner was neither impressive nor convincing, and a careful analysis of the testimony of Louis Buckner leaves the inevitable impression that it is not sufficient to rebut the evidence adduced by the appellees that he had sold them the house. And any possible doubt as to the soundness of that view is dissipated when the testimony is considered in connection with the subject matter of the contract, the situation and resources of the parties, their relative experience and intelligence, and the respective purposes which they were trying to accomplish.

The theory that these two illiterate, inexperienced, colored people, with no income or resources except what they could earn by hard manual labor, undertook to pay and in fact did pay nearly $1,000 a year for seven years for the privilege of occupying property a large part of which they could neither rent nor use, and from which they could have been evicted at any time upon thirty days' notice, is so unreasonable as to verge on absurdity. Nor is it likely that they would have been willing to pay what to them must have seemed such a very heavy rent for a property which only a year before had been sold to the appellants for $2,500, and which, when appellants took possession of it, was not only in need of repair but was also in an unbelievably dirty condition. Nor is there any real difference between the contract which Buckner wanted appellees to sign in 1926, and that which appellees say he actually made in 1919, except that he asked $3,000 more for the property in 1926 than in 1919, and he gave them no credit for the money which they had, as they supposed, paid on account of the purchase price of the house. And while the attempt to have appellees sign the 1926 con-

tract may have been a mere device to entice them into a position inconsistent with the claim that they had bought the property, it also permits the inference that, if he was willing to execute such a contract in 1926, Buckner may have been willing to execute a similar contract in 1919, especially as he admitted that he did offer to sell them the property in 1919 for $5,000. Nor is the fact that he required them to pay for such expenses as repairing the electric lighting system, removing objectionable tenants from the property, and placing the property in a habitable condition, consistent with the relation of landlord and tenant. These considerations relieve us of the necessity of any further comment on the evidence than to say that in our judgment it sufficiently supports the allegation that appellants sold to the appellees the leasehold property known as 405 S. Bond Street, in 1919, and that appellees have partially performed the contract, are ready, able and willing to complete it, and that it is of such a character that it will be specifically enforced by a court of equity.

Nor have we any doubt that, while the record title to the property is in Alexander Buckner and Elsya his wife, that Louis Buckner has an actual beneficial interest in it, the extent of which need not be determined.

The second question presented by the appeal is what part of the purchase price of the property has been paid. At the time the contract was made, Buckner gave to Jones a small blank book in which from time to time he would note the instalments paid by Jones or his wife. Usually, as they made such payments, the person making them would take a receipt for them on loose pieces of paper, and after several months these receipts would be handed to Buckner, who would enter them in the book, tear up the receipts, and return the book to the appellees. The entries in that book ran from March 15th, 1919, to April 29th, 1922. For some reason no weekly payments were credited in that book after March 11th, 1922, but on another memorandum book, in which the account was continued, the payment of March 11th was also entered, and also subsequent weekly payments to July 27th, 1925. After that entry in the second book

there follows a list of weekly dates to and including September 21st, 1926, which, however, fails to indicate what if any payments were made on those dates. The appellees testified that they made on the dates set forth in that list weekly payments aggregating $1,162.50 for which they received receipts, that at his request they gave those receipts and the book to Louis Buckner, and that he destroyed the receipts but failed to enter the amounts for which they were given in the book. The appellants deny that any such payments were made. The chancellor resolved that conflict in favor of the appellees, and concurred in the conclusions stated by the auditor in his supplemental report, filed February 2nd, 1928,

"that Jones paid Buckner up to September 21, 1926:
$7,385.35
Against which sum Buckner should be allowed:
Taxes, water rent and ground rent
paid by him..............$1,257.68
and net interest due him........: 1,168.53
and expenses for repairs, etc., paid
by him .................. 273.52
and insurance ............... 100.00

Balance....................... 4,585.62"

and from the total net payments subtracted $6.45, as a differential in favor of the appellants arising from the difference in the method of computing interest adopted by the auditor and that followed by the appellants. We have no difficulty in accepting the conclusions of the chancellor in regard to the disputed payments aggregating $1,162.50. They were largely based upon his opinion as to the relative credibility of the witnesses in the case, and in view of the superior opportunity available to him, but denied to us, of noting the demeanor and conduct of those witnesses, and of the further fact that whether such payments were made or not was purely a question of fact, which turned entirely on the credibility of the testimony, his conclusions should not be lightly disturbed. And a careful examination of the record dis-

closes no fact or circumstance sufficient to justify this court in setting them aside. But as it is not clear that the testimony taken at the second hearing before the court supplied sufficient data as to credits due Buckner to determine the balance which the appellees still owe on account of the purchase price of the property without a reference to the testimony given by Buckner before the auditor, the question arises as to whether the chancellor was authorized to consider that evidence in view of the fact that, when that testimony was taken, Buckner was not a party of record. Manifestly the interests of a party to a suit cannot be prejudiced by testimony taken before he became a party. *Buckner v. Jones, supra.* But that rule is based upon the principle that one who has not been afforded the privilege of cross-examining a witness may not be prejudiced by his testimony (1 *Greenleaf Evid.,* sec. 554; 3 *Greenleaf Evid.,* sec. 326; *Clary v. Grimes,* 12 G. & J. 31; *Smith v. Baldwin,* 4 H. & J. 331; *Cosby v. Wickliffe,* 7 B. Mon. (Ky.) 120; *Jenkins v. Bisbee,* 1 Edw. Ch. (N. Y.) 377), and is not to be applied in its original and naked severity to cases where the reason for it does not exist, and where the rights of the party affected are fully protected. *Kingman v. Higgins,* 100 Ill. 326. And clearly it has no application to the question before us upon the facts of this case.

The testimony was given by Louis Buckner himself, as to facts peculiarly within his own knowledge and, for the purpose of establishing credits in his favor, he testified before the chancellor after he had been made a party, and had at that time the fullest opportunity of supplying any testimony inadvertently omitted when he testified before the auditor. Under such circumstances we know of no valid reason why his testimony before the auditor should not have been considered by the chancellor, and we can conceive no possible way in which he could have been injured by such consideration. The chancellor found that the balance due the appellants on account of the purchase price of the property was $420.83, and the fact that, in reaching that conclusion, he

may have been influenced by Louis Buckner's testimony before the auditor, is not sufficient in itself to invalidate his finding, especially in view of the fact that Louis Buckner had the opportunity of supplying to the chancellor any additional facts known to him, and of correcting or enlarging the testimony so given. No attempt has been made by the appellants to point out to this court how or in what respect that finding is erroneous, and, after an examination of such data as the record offers, we have reached the conclusion that it was as fair, reasonable, and accurate as was possible upon the evidence in the case. The chancellor allowed appellants for the full purchase price of the property, accrued interest on unpaid instalments, for all repairs, taxes, ground rent, and other expenses properly proven, and charged him with all monies shown by the evidence to have been actually paid to him by the appellees.

At the argument of this case, the attention of counsel was called to the fact that the record included testimony taken at a former hearing before a different chancellor, and also the testimony of witnesses other than Louis Buckner before the auditor at times when Louis Buckner was not a party to it, and from what was said then, and from what appears in the record, this testimony was put in at the direction of counsel for the appellees. So far as the record discloses it was not considered by the chancellor. It had no possible connection with any issue presented to this court and had no place in the record. In affirming the decree appealed from, therefore, the cost of so much of the record as contains that testimony will be charged to the appellees.

> *Decree affirmed, the appellees to pay the cost above and below of so much of the record as contains the testimony taken at the first hearing of this cause before the chancellor then presiding, and the testimony of all witnesses other than Louis Buckner before the auditors, all other costs above and below to be paid by the appellants.*