ALMOND, ADMINISTRATOR D. B. N. *v.* McALLISTER ET AL.

[No. 153, October Term, 1952.]

412

*Decided May 15, 1953.*

The cause was argued before SOBELOFF, C. J., and DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*J. Mayer Willen,* with whom was *Walter M. Jenifer* on the brief, for appellant.

*J. Britain Winter,* with whom were *Winter and Bowen* on the brief, for appellees.

HENDERSON, J., delivered the opinion of the Court.

The contest in this case is between the estate of Georgia A. Thompson and her granddaughter, Nellie H. McAlister, concerning the ownership of a joint savings bank account in the usual trust form. The appellee contends, and the chancellor found, that the account passed to her by survivorship under the declaration of trust, and that the testimony supports and does not rebut the decedent's intention to create the trust.

Mrs. Thompson, after her husband's death in 1912, was employed as a domestic for a private family until 1922. For some years she lived with a daughter, Mrs. Clara Bull, then with her granddaughter, Mrs. McAlister. In 1933 she purchased the property 1724 Thomas Avenue, where she lived alone, except for a tenant on the second floor, until her death on September 20, 1951 at the age of 97. During the last five years of her life she was unable to leave her home, although she could move about with the aid of crutches. Clara Bull, who lived nearby, bought and prepared her food, and performed, or had her daughters perform, almost daily household duties. Mrs. Thompson's son-in-law, Dr. Houck, who was married to her daughter Ella May, furnished her medical attention.

In February, 1951, Mrs. Thompson discussed with Dr. Houck the disposition of her savings bank accounts. She had an account in the Eutaw Savings Bank of Baltimore of about $21,500 and accounts in Cockeysville and Easton banks amounting to about $6,000 in the aggregate. According to Dr. Houck, she asked him to put the accounts in the joint names of herself and Mrs. Houck, so that on her death Mrs. Houck could divide the money equally among all her children. Dr. Houck arranged this by opening a new account in the Eutaw Savings

Bank, and transferring the funds from the Cockeysville and Easton banks to a new account in the Calvert Bank. He subsequently delivered the new books to Mrs. Thompson. Mrs. Houck was an invalid, confined to her home because of arthritis, and took no part in these transactions except to sign the cards. On March 25, 1951 Mrs. Thompson, while alone at home, sustained severe injuries from burns.

Accepting Dr. Houck's testimony as to her instructions in regard to the accounts, it nevertheless appears that she subsequently expressed different views as to their disposition. On May 30, 1951 she wrote a letter, evidently intended for her children but delivered to the Eutaw Savings Bank, "to let you all know I gave all my books, bank books and papers to Dr. Houck to keep till I get well. I am going to have four thousand to give each one of the 5 children the names is May Houck, Clara Bull, Bessie Price and two boys Jarrett Thompson and Carrol Thompson all get the same four thousand peace." On June 15 she wrote a letter, subsequently delivered to the bank, "I am writing this on business for Mrs. Ella May Houck's name taking off my bank book." On June 18 she signed an order addressed to the Calvert Bank and witnessed by Nellie May McAlister, and received a check which was used to open a new account in the Eutaw Savings Bank on June 22 in the joint names of Mrs. Thompson and Mrs. McAlister. On June 19, by appropriate orders, new accounts were opened in the joint names of Mrs. Thompson and her five children named in the letter above mentioned, each in the amount of $4,000, leaving a balance of some $1,500 which was deposited in the name of Georgia A. Thompson alone.

The explanation of these transactions seems to be that early in June Mrs. Thompson was visited by her granddaughter, Mrs. Bruehl, the daughter of her son Henry Carroll Thompson and sister of Mrs. McAlister. Mrs. Bruehl testified that Mrs. Thompson told her she had given her books to Dr. Houck and instructed him she wanted each of her children, except Lula Bull, to

have some of her money, and also Nellie McAlister. She said Nellie had always been good to her. Apparently Mrs. Thompson had quarreled with her daughter Lula Bull many years before. She asked Mrs. Bruehl to have her father come to see her.

Henry Carroll Thompson testified he went to see his mother, and she told him: "Dr. Houck got my bank books and made out some names on there that is to get them there, and I want you to go down to the Eutaw Savings Bank and draw my money out and join it to the five children." He said he could not do that, he had his crops to look after. He said, "I'll get Clara Bull." She said, "I asked her to do it and she wouldn't do it. * * * I'll get Nellie McAlister to do it for me. She will do it. * * * She has never refused me." She said, "Maybe they won't like that." She said, "I intend sharing up with Nellie McAlister." This conversation was corroborated by a son and daughter-in-law of Henry Carroll Thompson, who were present at the interview. Barbara E. Thompson, wife of Henry C. Thompson, testified that a few days later Mrs. Thompson expressed her affection for Nellie and told her that if she got her bank books back she was going to give Nellie McAlister $10,000, if she had that much left.

Mrs. Clara Bull testified that about the middle of June she had a conversation with her mother about her bank books. Mrs. Thompson said she didn't know Ella May's name was on the books, and expressed surprise when Mrs. Bull showed her the signatures in the books, which had been delivered by Dr. Houck not long before. Nellie McAlister was there at the time. Mrs. Clara Bull went there because Nellie asked her to go with her "just go up to prove what * * * mother tells me to do." Mrs. Bull told Nellie, "I don't want to have anything to do with it whatsoever." Her mother had "mentioned to fix those books up for several years but she never could get nobody to do it for her on account of my sister being cut out. None of us would do it for her because we didn't think it was right for my sister [Mrs. Lula Bull]

to be cut out, * * *." Mrs. Thompson told Nellie in the presence of Clara Bull that she wanted the account in the Eutaw Savings Bank put in the names of the five children, $4,000 each, balance in her own name. That was to pay her bills and funeral expenses. Mrs. Thompson did not say anything about Nellie getting any money. According to Clara Bull, Mrs. Thompson told Nellie to transfer the Calvert Bank account to the Eutaw, and put it with the rest of the money left in her account. Nellie took the books and obtained Mrs. Thompson's signature to the various checks and cards a few days later, out of the presence of Clara Bull. Mrs. Bull said to her that evening: "Nellie, you took those books away before I seen any account of the Calvert Bank money." Nellie said she had been in a hurry to get home. Mrs. Bull did not learn of the joint account in Nellie's name until after Mrs. Thompson's death on September 20, 1951. Nellie had put the books in a safe deposit box in her name and that of Mrs. Thompson. Mrs. Bull admitted that this was in accordance with instructions from Mrs. Thompson.

Mr. Grothaus, teller of the Eutaw Savings Bank in charge of new accounts, testified that Mrs. McAlister discussed with him the opening of the account in the joint names of Mrs. Thompson and Mrs. McAlister, with the proceeds from the Calvert Bank. He testified: "Mrs. McAlister signed the card in my presence at the bank, when she took that to Mrs. Thompson to have signed, and Mrs. Thompson signed that at home. Then they were brought back with the check on the Calvert Bank." When she took the card to Mrs. Thompson, Mrs. McAlister's name was on it, but Mrs. Thompson's name was not. He initialed the place where Mrs. Thompson was to sign, directly above the signature of Nellie May McAlister. When the card was returned to him Mrs. Thompson's signature was on it.

The most recent case on the subject of joint savings bank accounts is *Hancock v. Savings Bank of Baltimore*, 199 Md. 163, 85 A. 2d 770. There a cousin of the de-

cedent obtained her signature to a card opening a joint trust account of about $19,000 when the decedent, 88 years of age, was in a hospital suffering from a broken leg. There was testimony from a doctor and nurse that the occasion for the transfer was in order that the cousin might be enabled to pay the decedent's hospital and medical bills. There was no testimony as to any statements by the decedent at that time of her intention that the cousin should take the balance by survivorship, or as to the disposition of her estate. The decedent was not able to read, and the order was not read to her. But it was held, by a divided court, that the entry, plus certain statements that the decedent intended to leave her property to the cousin made some years before, was sufficient to sustain the gift. The court reversed the decision of the chancellor.

In that case it was agreed that a confidential relationship existed, placing the burden on the dominant party to show that the transaction was fair and reasonable. *Cf. Manos v. Papachrist,* 199 Md. 257, 86 A. 2d 474; *Carter v. Abramo,* 201 Md. 339, 93 A. 2d 546, and *Vocci v. Ambrosetti,* 201 Md. 475, 94 A. 2d 437. The majority opinion stressed the fact that the transaction did not strip the grantor of her property, since she retained the power to revoke the transfer. The minority opinion pointed out that the burden was to show not only that the transaction was fair, but also that the transferor was fully informed and clearly understood the legal import of the paper signed.

Measured by either test, we think the transfer in the instant case should be sustained. It is true that there is no direct testimony as to the instructions given to Mrs. McAlister except that of Mrs. Clara Bull, who testified that the Calvert Bank account was to be put with the rest of her money in the Eutaw Savings Bank in the name of Mrs. Thompson alone. Mrs. Thompson's lips were sealed by death and Mrs. McAlister's by the Evidence Act. Code (1951), Art. 35, sec. 73. But a strong inference may be drawn that Mrs. Thompson

did not wish to take Mrs. Bull into her confidence. Nor did her specific instructions as to the amounts that her five children were to receive, and the amount she thought necessary for her bills and funeral expenses, negative an intention to dispose of the remaining $6,000 in some other manner. If she intended her children to receive it, it seems unlikely that she would have named the exact sums they were to receive. Of course, if it were to pass under her estate in intestacy, Lula Bull would share in it, contrary to her expressed wish.

A still stronger circumstance is the fact that when she signed the card setting up the joint account in question, Nellie's signature was on it. This would seem to negative any intention to deceive on Nellie's part. The suggestion in Dr. Houck's testimony that Mrs. Thompson may have been unable, on account of her illness and senile condition, to apprehend what she was doing, seems clearly rebutted by the fact that she was able to write, as demonstrated by her letters, and to read, as admitted by Mrs. Bull. Indeed, Dr. Houck admitted she could read with difficulty. There is no question here, as in the *Hancock* case, of a transfer for a limited purpose only, or a misapprehension as to the legal purport or purpose of the paper executed. In the light of her previous experience with transactions of this kind, particularly those involving the signatures of Ella May Houck, we cannot suppose that she would have knowingly signed the card with Mrs. McAlister's name on it unless she had intended to make her the beneficiary. And this is perfectly consistent with the intention contemporaneously expressed to six other witnesses. It is true that these witnesses were closely related to Nellie, but at least in the case of Henry Carroll Thompson the admission was against his pecuniary interest. In any event, we may rely upon the finding of the chancellor, who saw and heard the witnesses, on questions of credibility. The Rev. Cuppett, a completely disinterested witness, testified that Mrs. Thompson could see to do fine embroidery work shortly before her death, and that

he "was impressed with the clarity of her thought." We think the appellee has sustained the burden imposed upon her.

*Decree affirmed, with costs.*