### In re LELA AND COMPANY, INC., Petitioners,

### Dr. and Mrs. Rafael Angel Pagan, Intervenors.

### No. 75–2140.

United States Court of Appeals, District of Columbia Circuit.

Argued 9 Sept. 1976.

Decided 6 Jan. 1977.

noted that the availability of food stamps would lessen the impact of an erroneous termi-

nation of disability payments. 424 U.S. at 342, 96 S.Ct. at 906, 47 L.Ed. at 38, n.27.

Howard S. Spering, Chevy Chase, Md., for petitioners.

W. H. Beckerleg, Hato Rey, P. R., for intervenors.

Before TAMM, MacKINNON and WIL-KEY, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILKEY.

WILKEY, Circuit Judge:

The petitioners in this case are thirty-nine parties who invested $146,000 in various limited partnerships that were organized to purchase, hold or operate real estate in Puerto Rico. Without their knowledge or consent, these funds were diverted to the purchase of two parcels of real estate by Lela and Company, Inc., which has become insolvent. In March of 1975 the defrauded investors filed a petition in the District Court for involuntary reorganization of Lela under Chapter X of the Bankruptcy Act.[1] The District Court referred the matter to a Bankruptcy Judge who filed a report,[2] after proceedings before him, which recommended dismissal of the petition. The District Court itself then heard argument from the petitioners and an intervenor and issued a Memorandum and Order,[3] the subject of this appeal, which dismissed the petition.

The first ground of the dismissal was that the petitioners were not "creditors," as defined by the Bankruptcy Act,[4] and were thus ineligible to petition for involuntary reorganization.[5] Secondly, the District Court found that although the petitioners were "honorable and sincere" the petition had not been filed in "good faith," within the special meaning of that term in the Bankruptcy Act.[6] For the reasons set out below we disagree with the conclusions of

the District Court, reverse his dismissal and remand for further proceedings.

## I

Because the facts of this unusual and tangled story are critical to a disposition of the issues, it is necessary to set them out in some detail. On 8 January 1971 Lela and Company, Inc. (Lela) was incorporated under the laws of Puerto Rico in order to engage, as its stated purpose, in the purchase, rent and sale of real estate. According to the person who has acted as the President of Lela,[7] its incorporators never elected any directors or officers, adopted any by-laws or corporate seal, nor issued any stock.

On 27 January 1971 Lela purchased a parcel of land for $375,000; $30,000 was paid in cash at the time of sale and the balance was financed by a first and second mortgage.[8] Located in the Hato Rey area of San Juan, Puerto Rico, this land (the Hato Rey property) is almost an acre in size and is zoned for commercial use. In the immediate vicinity are the largest banks in Puerto Rico, the largest office buildings, and the area continues to develop rapidly. In short, although the building itself is inadequate for the location, this is prime commercial real estate. At the time of sale it was occupied by a tenant auto dealer who paid monthly rent. Subsequent to the purchase a total of about $175,000 has been paid to reduce the outstanding mortgage principal. The mortgagees have thus acquired a comfortable cushion of excess value above the mortgage indebtedness existing at the time of filing the Chapter X bankruptcy petition.

1. 11 U.S.C. §§ 501 et seq.

2. Report of Special Master, 9 June 1975, Appendix (App.) at 68.

3. Memorandum and Order, 29 October 1975, App. at 86.

4. 11 U.S.C. § 506(1, 4).

5. See 11 U.S.C. § 526.

6. 11 U.S.C. § 546.

7. Affidavit of William S. Tyson (filed with petition), App. at 18.

8. The first mortgage amounted to $180,000 and the second, which was taken from the seller, to $165,000. The deed to the real estate as well as the second mortgage were not recorded in the Puerto Rico land records, although received, apparently because no corporate resolution attesting to the authority of the purchaser for Lela was submitted.

On 21 April 1971 Lela purchased some residential properties on Calle Arzuaga in San Juan for $250,000. Lela paid the owner $500 cash down with the remainder financed by a mortgage on which principal payments were not to be made for ten years, and on which the interest payments per year would total about twice the previous rental income. The "four small contiguous lots" that make up the parcel (the Calle Arzuaga property) contain small houses "in poor condition," which at the time of sale also paid monthly rent. At the time the petition was filed these two properties—at Hato Rey and at Calle Arzuaga—constituted the major assets of Lela.

In December of 1971 two limited partnerships were formed in Maryland into which the petitioners here paid their money. The agreements provided that the partnerships would purchase, hold or operate properties on the island of Puerto Rico,[9] and for one partnership the Hato Rey property was particularly designated.[10] The limited partners later learned that their funds had not been segregated and used in the name of the partnerships but had been applied to the credit of Lela in payments on the Hato Rey property. In the case of still another limited partnership[11] which was created to hold the Calle Arzuaga property, it appears the funds of these investors, who are not among the petitioners, were also used by Lela in its own name in payment of that mortgage.

In the years 1971 through 1973 regular payments were made on interest and principal for the two mortgages at the Hato Rey property. In 1973 Lela began to default on its payments and in 1974 the tenant on the property left. With regard to the Calle Arzuaga property as well, payments on the mortgage were made for about two years and then lapsed.

During this period Lela had no bank account or office in Puerto Rico but conducted its correspondence and business from the Washington, D.C., office of its acting president, William S. Tyson. This office was also listed as the principal place of business of the limited partnerships, although it does not appear that any business was ever transacted in their name. Tyson was General Partner of one of the partnerships, CAP Limited, and that partnership was General Partner of the other, CAP-Hato Rey Limited.[12] All the activities of the partnerships and of Lela "were forced to terminate in November 1973 for lack of funds," according to Tyson.[13] Despite its inactivity, however, Lela does "continue with corporate existence."[14]

On its default the holder of the second mortgage on the Hato Rey property sued Lela for the full balance remaining and other costs, and received on 20 January 1975 a judgment of about $140,000—without any appearance on the part of Lela. The holder of the Calle Arzuaga mortgage also sued Lela upon its default, and received a judgment in late 1974 of around $300,000, again without opposition. The petition to reorganize Lela under Chapter X was filed on 31 March 1975 when title to both properties still remained with Lela.

One of the major concerns of the petition was that the extensive funds, some $194,000, that had been diverted from the part-

---

9. The one with this general purpose was the Caribbean Auto Park Limited Partnership (CAP) which raised about $169,000 over the course of a year.

10. This one was named the CAP-Hato Rey Limited Partnership. It raised about $25,000 in 1972.

11. This was the Calle Arzuaga Limited Partnership; its General Partner was listed as the CAP Limited Partnership.

12. Tyson has been sued by the SEC for his involvement in the organization of a number of

fraudulent limited partnerships. A consent decree has been entered enjoining him and other defendants from engaging in similar promotional arrangements.

13. Affidavit of Tyson, App. at 20.

14. Letter of 5 May 1975 from Puerto Rico Department of State. Lela had not filed annual reports for 1971, 1972 and 1973, however, and was considered "not in good standing" by the Department. App. at 27.

nerships to pay off the Hato Rey mortgages for Lela would be "sacrifice[d]" if the property was sold at foreclosure.[15] The petition sought a new management for Lela which could obtain a new tenant and a refinancing for the properties, or, if necessary, could arrange a sale at a price closer to market value.

Before continuing with our chronology it would be helpful to state more fully this central contention of the petitioners. Lela purchased the Hato Rey property for $375,000 and made payments on both mortgages steadily for about two years, drawing substantially on the partnership funds. The balance owed is about $200,000 with about another $75,000 in accrued interest and unpaid taxes. A current appraisal of the property—the land alone—amounts to over $600,000.[16] A sale at that price, of course, would likely leave a substantial excess over the $275,000 owed by Lela to be distributed to the defrauded investors. A foreclosure sale, on the other hand, because it is forced, commonly results in a price far below market value, perhaps just enough here to cover the judgment against Lela. Hence, a reorganization would seek to avoid the "sacrifice" of petitioners' value by installing management for Lela that could operate the properties profitably or, if necessary, sell them at a sound price.

The District Court referred the matter to a Bankruptcy Judge who conducted a hearing on 7 May 1975. No one appeared in opposition to the petitioners; indeed, Tyson consented to granting it. Petitioners and others testified that there were third par-

ties interested in refinancing the debtor in a reorganization. On 16 May the District Court granted a stay of further proceedings, e.g., foreclosure, in lawsuits against Lela. As noted, the report of the Bankruptcy Judge, filed 6 June, urged that the petition be dismissed. Intervening in the oral argument of 23 October before the District Court was counsel for Dr. and Mrs. Pagan, the holders of the Calle Arzuaga mortgage. Soon thereafter the District Court issued a Memorandum and Order dismissing the petition. It later extended the stay on lawsuits for 10 days so that appeal could be had to the Court of Appeals. On 5 December a motions panel of this court denied a stay of lawsuits pending this appeal.

■ At oral argument counsel for the intervenor informed the court that both properties of Lela had been sold at public auction in the spring and summer of 1976. The Calle Arzuaga property was reacquired by the Pagans and the Hato Rey property by the holders of the second mortgage. Those foreclosure sales, however, despite their legality,[17] are not irrevocable and do not moot this case. For when a trustee is appointed here for reorganization, he will be vested with the *title of Lela as of the date of the filing of the petition*,[18] except to the extent that a subsequent good faith purchaser for value may have a defense against the trustee.[19] Due to this latter possibility the District Court on remand must promptly enjoin the present holders of title from any further transfer of interest to the injury of Lela.

**15.** Creditor's Petition Under Chapter X, App. at 11.

**16.** This appraisal was conducted by an independent firm but was conditioned upon exposure for sale "in the open market allowing a reasonable time to find a purchaser. . . ." Appellants' Br. at 9.

**17.** The District Court has exclusive jurisdiction over the debtor's property upon the filing of a petition, 11 U.S.C. § 511, and is expressly empowered to stay a mortgage foreclosure "upon cause shown" prior to the approval of a petition, 11 U.S.C. § 513. Presumably, a stay of

foreclosures pending the appeal of a dismissal will be also granted only "upon cause shown." The provision for an automatic stay on foreclosures *after* a petition is approved, 11 U.S.C. § 548, further demonstrates that the issuance of any stay prior to approval is discretionary. *See In re Long Island Properties, Inc.,* 42 F.Supp. 323 (S.D.N.Y.1941) (Rifkind, J.).

**18.** 11 U.S.C. § 586. *See also* 11 U.S.C. § 110(a).

**19.** See 11 U.S.C. § 110(d).

## II

The Bankruptcy Act provides that the debtor corporation itself may file a petition, a "voluntary" petition, for reorganization under Chapter X.[20] Or, as in this case, a petition, an "involuntary" petition, for reorganization may be filed by "creditors who have claims against a corporation or its property."[21] Elsewhere in the Act, "creditor" is defined to mean "the holder of any claim," and "claim," in turn, is to include "all claims of whatever character against a debtor or its property, *except stock* . . ."[22] Thus, the eligibility of the petitioners to file here turns on whether they should be more properly characterized as "shareholders" or "creditors" of Lela.

The District Court gave essentially two reasons for considering these petitioners as shareholders. He said, first of all:

> Their investment in the limited partnership was diverted to Lela and if Lela's shares had issued the shares would be an asset of the partnership. Thus they are individuals who have an equitable interest in shares of Lela.[23]

To borrow from the language of the Bankruptcy Judge,[24] the petitioners by this analysis could be likened to "theoretical stockholders" of Lela due to their interest in any stock that would have issued. The District Court held secondly:

> In any event, whatever petitioners' status as shareholders, issuance of stock in Lela would immediately terminate any position they might have as creditors of the corporation.[25]

Because a reorganization of Lela would "effectively convert the petitioners into shareholders," the District Court believed that this would "abort further proceedings."

According to this second holding, even if petitioners could properly be classified as creditors, the petition should still be dismissed, as their prospective conversion to shareholders renders them ineligible to file at the outset. Let us consider this second holding first because; if it is correct, it obviates any reason to dispute the correctness of the initial characterization.

 The Bankruptcy Act provides that a plan for reorganization under Chapter X "shall include in respect to creditors . . provisions altering or modifying their rights, either through the issuance of new securities of any character or otherwise."[26] By the terms of this provision, a plan can convert creditors, presumably even those who filed the petition, into shareholders of the debtor. "The phrase 'issuance of new securities of any character or otherwise' enables a plan to offer securities of the reorganized debtor to creditors. . . ."[27] The acceptability of this conversion was revealingly demonstrated in the early case of *Consolidated Rock Co. v. Du Bois*,[28] where the Court reviewed a plan as to the *grade* of securities creditors could be offered, with no dispute at all as to the capacity of the plan to convert them into shareholders. There was no thought that, by operation of an approved plan of reorganization itself, creditors could lose their rights by being changed into shareholders.

 The conversion of creditors to shareholders, moreover, does not have to block future proceedings because the Act allows for extensive shareholder participation once the petition is granted. See *Price v. Gurney*.[29] For example, "any . . . stockholder of the debtor shall have the right to be heard on all matters arising in a

---

20. 11 U.S.C. § 526.

21. *Ibid.*

22. 11 U.S.C. § 506(1, 4) (emphasis added.)

23. Memorandum and Order, App. at 87.

24. Report of Special Master at 10.

25. Memorandum and Order, App. at 87.

26. 11 U.S.C. § 616(1).

27. 6A *Collier on Bankruptcy* § 10.03 at 427 (14th ed.).

28. 312 U.S. 510, 528–530, 61 S.Ct. 675, 85 L.Ed. 982 (1941).

29. 324 U.S. 100, 103–104, 65 S.Ct. 513, 89 L.Ed. 776 (1945).

proceeding under this chapter [X]." [30] And finally it is. not undeniably certain that these petitioners will necessarily be converted into stockholders of Lela. After all, those third parties who have professed interest in refinancing Lela may become its stockholders under the plan of reorganization while the petitioners may be allowed to continue as creditors.

■ Returning to the first ground of the District Court, its position was that because the partnership funds had been wrongfully diverted to Lela the partnership would have had an "equitable interest" in any stock that Lela would have issued. Thus, the petitioners here who hold the partnership property are, in effect shareholders because that is what their status would have been if Lela had been a completely organized corporation. As we shall see, however, from an application of the principles of trust law, which govern this situation, the petitioners are not necessarily limited to interests in hypothetical stock but *hold an equitable lien against the property of Lela, e.g.,* the Hato Rey property, and can thus be characterized as secured creditors, eligible to file a petition.

It bears reminding at the outset that the definition of shareholder is set as an exception against a very "sweeping" view of what constitutes a claim and, hence, a creditor.[31] The Bankruptcy Act defines "stock" to include "membership, shares, and similar interests in a debtor," [32] a definition which in this instance poses the question rather than answers it. To determine if these interests are to be characterized as "shares," let us turn to state law, acknowledged as a source of law under the Bankruptcy Act.[33] Under the law of Maryland, where the limited partnerships were organized, it appears that the wrongful diversion of partnership funds by Lela created a constructive trust. Its Court of Appeals has held:

A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another person on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may arise because it was acquired . . . through wrongful disposition of another's property.[34]

The Bankruptcy Judge also found that a constructive trust was imposed upon the partnership funds that were diverted to Lela.[35] As Professor Scott put it, in terms applicable to this case, "[w]here A's money is used by B without A's consent in purchasing property in B's name, B holds the property upon a constructive trust for A." [36] Under the theory of a constructive trust, therefore, Lela holds title to the Hato Rey property on behalf of the partnerships, as their funds have been applied to its purchase and payment. On the assumption that the partnerships had been dissolved by the "retirement" of the general partner,[37] Lela holds title on behalf of the individuals who comprised the partnerships, the petitioners.

■ What is the consequence of a constructive trust in these circumstances? What status does it afford the petitioners? In the analogous situation where a conventional trustee wrongfully uses trust money to acquire property, the Maryland Court of

---

**30.** 11 U.S.C. § 606.

**31.** "The word 'claims' as defined in § 106(1) [11 U.S.C. § 506(1)] is sweeping in scope. . . . [It] is, of course, a more inclusive definition than that applicable in ordinary bankruptcy, and it should be given a broad construction with respect to claims and creditors in order to dispose of all liabilities of the debtor in reorganization." 6 *Collier on Bankruptcy* § 2.05 at 311–312 (14th ed.).

**32.** 11 U.S.C. § 506(12).

**33.** *Price v. Gurney,* 324 U.S. 100, 106, 65 S.Ct. 513, 89 L.Ed. 776 (1945).

**34.** *Carter v. Abramo,* 201 Md. 339, 343, 93 A.2d 546, 548 (1953). *See also Maryland National Bank v. Tower,* 374 F.2d 381 (4th Cir. 1967) (statement of Maryland law in diversity case).

**35.** Report of Special Master at 10.

**36.** V *Scott on Trusts* § 508.1 at 3579 (3rd ed.).

**37.** 73 Md.Ann.Code § 20 (1970).

Appeals followed the Restatement of Trusts[38] in affording the beneficiary the option of "enforc[ing] an equitable lien upon [the property] to secure his claim against the trustee."[39] So too for a constructive trust, where "the defendant wrongfully uses money of the plaintiff in purchasing property," Professor Scott notes that "the plaintiff is entitled at his option either to enforce a constructive trust or to enforce an equitable lien [against the property.]"[40] The existence of these options, as we shall now see, is critical to our finding of creditor status.

If the equitable relief under a constructive trust were only to reach to the wrongdoer, then the petitioners here would probably be limited to an equitable interest in Lela itself, such as in any shares it might issue. But trust law allows the petitioners here to trace the path of their money to the property acquired and impose a lien upon it as a security for their claims of restitution against Lela. Hence, even if Lela had issued stock, petitioners would have had the option of pressing their lien against the property, like secured creditors, rather than seeking an interest in the stock, which would have cast them as stockholders. The Bankruptcy Act defines a creditor as one who holds a claim "against a debtor *or its property*."[41] Petitioners may fairly be styled as creditors here, eligible to file a petition and a claim against the property held by the bankrupt on the day of the petition.

This result, that petitioners are not stockholders of Lela, probably also reflects the original understanding of the investors. They did not desire or intend to become stockholders, legal or equitable, in a corporation; they contributed their money to a limited partnership in which as partners they would hold title to real estate directly. This difference in title between their position as limited partners and their theoretical position as shareholders is significant. If title had been taken in the name of the partnership, then when the state foreclosure proceedings in Puerto Rico were undertaken, as named partners in a limited partnership they individually would have been entitled to notice at various points, certainly before the foreclosure sale. In contrast, as events developed, only Lela was given notice of the state proceedings against the Hato Rey property, and Lela failed to appear.

Even if it may have been envisioned that a corporation would hold title to the real estate, as may have been necessary under local law,[42] the investors did not know about Lela until after the fraudulent scheme had been exposed. And then they were surprised to discover that the real estate they had thought was owned by the limited partnerships were actually held by Lela. To regard them as stockholders of Lela is considerably at odds with their original understanding and intent.

■ Finally, the result here does not appear to clash with the purpose behind the shareholder exclusion from filing. According to *Price v. Gurney*,[43] a shareholder was not allowed to file for reorganization because, "the initiation of the proceedings, like the run of corporate activities, is left to the corporation itself, *i. e.* to those who have the power of management." Congress did not intend, Justice Douglas wrote for the Court, that upon petition of a shareholder a bankruptcy court would have jurisdiction to determine as a matter of local law who had the authority to speak for a corporation. However, where the corporation, as here, does not contest the petition

---

**38.** *Restatement of Trusts* § 202 (1935). This section was retained in the *Restatement (Second) of Trusts* (1959).

**39.** *Corbett v. Hospelhorn,* 172 Md. 257, 191 A. 691, 699 (1937).

**40.** V *Scott on Trusts* § 463 at 3425 (3rd ed.).

**41.** 11 U.S.C. § 506(1) (emphasis added).

**42.** William Tyson testified before the Bankruptcy Judge that Lela was created because he was told, "right or not, I don't know," that a limited partnership could not hold property in its name in Puerto Rico. App. at 55.

**43.** 324 U.S. 100, 104, 65 S.Ct. 513, 515, 89 L.Ed. 776 (1945).

**408**

then there is less need to worry that a petition for reorganization may be filed by parties who conceivably could be characterized as shareholders.

## III

 Provided that a petition meets the requirements of the Bankruptcy Act, the judge is directed to approve it "if satisfied that it . . . has been filed in good faith."[44] The Act establishes standards for determining when a petition has not been filed in good faith, such as when "it is unreasonable to expect that a plan of reorganization can be effected,"[45] but does not intend for these enumerated standards to limit the "generality" of the term. The overall test, however, is not sincerity or honorableness; indeed, the District Court here recognized these traits in the petitioners, who were considered nonetheless not to be proceeding in "good faith." Rather, "good faith is a criterion which enables the judge to determine, on the particular facts presented, whether the financial, economic and legal situation of the debtor is one within the contemplation of Chapter X."[46]

Without making reference to any of the particular statutory reasons, the District Court found that the petitioners lacked "good faith" essentially because neither the purpose of the reorganization nor the structure of the corporation were congruent with Chapter X. As to the first of these reasons, he stated:

The purpose of this proceeding is to block the debtors [the mortgage holders] going to judgment and to arrange a sale of the

property in the hope that an arm's length transfer through a trustee will salvage some value for petitioners.[47]

Noting that a Puerto Rican court of equity would have authority to prevent the dissipation of corporate assets, the District Court concluded that this type of situation was not "amenable to Chapter X reorganization."

 It is certainly the case, as the District Court has intimated, that Chapter X is not to be invoked for petitioners who envision only that their plan will "accomplish a slow and orderly liquidation," *Fidelity Assurance Ass'n v. Sims.*[48] "Congress did not intend a Chapter X case to be turned into a liquidation proceeding at the outset, but intended the litigation to become a straight bankruptcy only after the failure to consummate a plan . . .."[49] In the *Sims* case, the District Court found, and the Supreme Court agreed, that there was "no prospect" that the company could be successfully reorganized; under these circumstances, Chapter X was held to be the wrong vehicle for what could only be a "plan for liquidation."

 Where the financial picture of the debtor does provide a prospect of successful reorganization, however, it is not an impermissible purpose that the reorganization seeks to avoid "the harsh consequences of liquidation."[50] In dictum that aptly fits this case, Justice Douglas wrote for the Court:

If there were a showing, for example, that the property was worth more than

---

**44.** 11 U.S.C. § 541.

**45.** 11 U.S.C. § 546 provides, in full:
Without limiting the generality of the meaning of the term "good faith", a petition shall be deemed not to be filed in good faith if—
(1) the petitioning creditors have acquired their claims for the purpose of filing the petition; or
(2) adequate relief would be obtainable by a debtor's petition under the provisions of chapter 11 of this title; or
(3) it is unreasonable to expect that a plan of reorganization can be effected; or

(4) a prior proceeding is pending in any court and it appears that the interests of creditors and stockholders would be best subserved in such prior proceeding.

**46.** 6 *Collier on Bankruptcy* § 6.07 at 1019 (14th ed.).

**47.** Memorandum and Order, App. at 88.

**48.** 318 U.S. 608, 617, 63 S.Ct. 807, 811, 87 L.Ed. 1032 (1943).

**49.** *Sims, supra* at 622, 63 S.Ct. at 814.

**50.** *In re Southern Land Title Corporation,* 301 F.Supp. 379, 409 (E.D.La.1968).

the amount of the first mortgage indebtedness and it appeared that that excess value would be lost to the junior interests in the state proceedings . . . approval of the petition clearly would be justified . . ..[51]

In this case, as noted, there has been an appraisal of the Hato Rey property at over $600,000, more than the total mortgage indebtedness of about $200,000 against the land. Considerable loss of value could be expected from the forced sale since its full value was conditioned on a sale over a reasonable time. It also does not appear that the reorganization plan would have to constitute a "liquidation proceeding at the outset," as *Sims* warns us is inappropriate. Petitioners have identified third parties willing to refinance Lela; a trustee would undoubtedly seek a profitable re-leasing of the land and a sound new management. Indeed, after reorganization, eventual liquidation for the satisfaction of petitioners' claims may become only one of several possibilities, particularly if petitioners are converted to shareholders.

As his second basis for finding no "good faith," the District Court turned to Lela's lack of structure. He wrote:

> Lela is not a going concern. The company has no employees or on-going activity. It has no management, no cash or liquid assets, no public debts, and no widespread group of investors.[52]

Characterizing the reorganization as "an attempt to protect investments by creating a functional corporation in which the partnership would hold shares," the District Court concluded that Chapter X was not available for this purpose. The District Court's statement appears to reflect two separate apprehensions: the first is that given the lack of structure it may not be possible to have an effective reorganization, and the second is that even admitting the possibility of reorganization the small and private nature of Lela make it inappropriate for Chapter X.

As quoted earlier, the Bankruptcy Act provides that a judge may find no "good faith" where "it is unreasonable to expect that a plan of reorganization can be effected." The case law on this ground demonstrates a marked judicial disposition to resolving doubts about whether a plan can be effected in favor of the petition.[53] Since the Act provides for later judicial review of the plan that has been formulated,[54] a court must be careful to avoid premature rejection of the possibility of a plan at this early stage. This is particularly so when the debtor corporation here, as illustrated earlier, possesses worth in its property in excess of its liabilities. As the Third Circuit considered it, "The value of the assets when the petition was filed was an important determination with regard to possible reorganization."[55] In fact, the assets of Lela already seem to have shown their potential as evidenced by the possible refinancing that has been identified.

The fact that Lela may now be largely a "paper company," as the District Court viewed it, does not by itself mean that its vitalization is impossible. The corporate existence does continue, with the full range of corporate structure and activity available for whatever new management is selected. And, moreover, Lela has not always been entirely dormant; for two years rents were collected from the properties and mortgage payments were made to its credit. Ordinarily, as in *Sims*,[56] when the impossibility of a plan warrants rejection of

**51.** *Marine Properties v. Trust Co.*, 317 U.S. 78, 86, 63 S.Ct. 93, 97, 87 L.Ed. 64 (1942).

**52.** Memorandum and Order, App. at 88.

**53.** "The whole scheme of Chapter X indicates that this test should not bar approval of a petition unless it is abundantly clear that there is no possibility that a plan of reorganization can be effected," *A–Cos Leasing Corporation v. Wheless*, 422 F.2d 522, 524–525 (5th Cir. 1970).

See also *In re Bermec Corporation*, 445 F.2d 367 (2d Cir. 1971).

**54.** See 11 U.S.C. § 574.

**55.** *In re Business Finance Corporation*, 451 F.2d 829, 835 (1971).

**56.** 318 U.S. 608, 616–618, 63 S.Ct. 807, 87 L.Ed. 1032 (1943).

the petition, it is because the company is so hopelessly insolvent. But here, where the financial situation is not so bleak, the possibility of reorganization should not be thwarted because the current structure of the corporation is largely a shell. Indeed, as we shall now see, the installation of new management, which can remedy the "insolvency" of the corporate form, is one of the purposes of Chapter X.

■ Two of the factors listed by the District Court as significant in his dismissal were that Lela had "no public debts" and that it had "no widespread group of investors." Even if the District Court regarded effective reorganization as possible, it appears, from the traits listed, that he simply considered Chapter X inappropriate, for these particular factors have been recognized by the Supreme Court as figuring in such a determination. According to *SEC v. American Trailer Rentals*,[57] "Chapter X is the appropriate proceeding for adjustment of publicly held debt," and "Chapter X is . . . the appropriate proceeding where the debtor has widespread public stockholders . . . ." As will be seen from a closer reading of the Supreme Court cases, however, these traits, which Lela does not possess, are only some of the conditions that justify Chapter X. One of the other traits which has been identified is a need for a new management, one of the goals of this reorganization.

In the course of deciding which corporate reorderings should proceed under Chapter X and which under Chapter XI, a series of Supreme Court opinions has established the approach to determining the appropriateness of Chapter X.[58] Since Chapter XI is not available to Lela here,[59] however, this court must not read the Chapter X description in these cases with undue narrowness because a dismissal under Chapter X will thereby preclude any reorganization. But, in any event, this petition does fit within the contours of Chapter X that have been articulated. Writing for the Court in *General Stores Corp. v. Shlensky*,[60] Justice Douglas faced directly the argument that Chapter X should be reserved for large, public companies and XI for smaller, private ones. Noting that an earlier Chapter X case, *SEC v. United States Realty Co.*,[61] had rejected the character of the debtor as the controlling consideration, he wrote that: "The essential difference is not between the small company and the large company but between the needs to be served." [62]

■ The advantage of a Chapter X proceeding is the extensive reorganization that a disinterested trustee can implement under the supervision of the court and with the advice of the SEC.[63] When does the advantage of these Chapter X "controls" become appropriate? The answer from *Shlensky* is that

**57.** 379 U.S. 594, 613, 615, 85 S.Ct. 513, 524, 13 L.Ed.2d 510 (1965).

**58.** *SEC v. United States Realty Co.*, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940); *General Stores v. Shlensky*, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550 (1956); *SEC v. American Trailer Rentals, supra*.

**59.** Chapter XI generally, seeks an "arrangement" for the "settlement, satisfaction, or extension of the time of payment of [the] unsecured debts" of the debtor. 8 *Collier on Bankruptcy*, § 401 at 343 (14th ed.). The petition must be filed by the debtor itself, which may retain possession of its property. *See* 11 U.S.C. § 732. The Creditors' Petition stated that reorganization would be possible only under Chapter X because Lela would be unable to file a Chapter XI petition, there being no internal corporate organization. The petition also recited that charges against Lela's property

would have to be adjusted, which presumably would be impossible since Chapter XI reaches only unsecured debts. These allegations of unavailability of Chapter XI have not been disputed by the Bankruptcy Judge, the District Court, or the intervenor and also appear sound to us.

**60.** 350 U.S. 462, 465–466, 76 S.Ct. 516, 100 L.Ed. 550 (1956).

**61.** 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1293 (1940).

**62.** *Shlensky, supra*, 350 U.S. at 466, 76 S.Ct. at 519.

**63.** If the scheduled indebtedness of the debtor is below $3 million, the judge may, at his discretion, submit the proposed plan to the SEC for an examination and advisory report. 11 U.S.C. § 572.

*These controls are essential* both where a complicated debt structure must be readjusted and *where a sound discretion indicates* either that there must be an accounting from the management or *that a new management is necessary.*[64]

While the usual rehabilitation of an insolvent corporation entails largely a careful resettlement and redirection of its finances, another primary purpose of Chapter X may be the installation of new management. Speaking realistically, "[w]ithout a new management today's readjustment may be a temporary moratorium before a major collapse." [65]

With regard to Lela, of course, the installation of vigorous new management is indispensable, as it will be challenged with the need to vitalize the corporate form as well as to structure the new financing and operation. With the competing claims of the mortgage holders and the petitioners, the oversight and approval of the court provides important assurance that the trustee acts with disinterest. In addition, it may be that a trustee under court supervision may seek to investigate and account for past mismanagement, for whatever benefit might accrue to Lela.[66] In short, the case that the petitioners have made out does present an appropriate "need to be served" by a Chapter X proceeding.[67] The fact that Lela is relatively small in size and limited in claimholders does not appear by itself to exclude it from Chapter X. The Act itself does not establish any such threshold and corporations similar in nature have been admitted into Chapter X elsewhere.[68] Where a pervasive reorganization is needed, then "Chapter X is available, whether the debtor is large or small or whether there are many classes of securities to be adjusted or just one." [69] We note that the petitioners (claimholders) are nearly all residents of the District of Columbia metropolitan area, and that the records of Lela are in the hands of the United States Attorney for the District of Columbia.

The case is remanded to the District Court for further proceedings under Chapter X. As noted earlier, the court should promptly assure that the interest of Lela in the two properties is not further impaired pending the reorganization.

---

**64.** 350 U.S. at 467, 76 S.Ct. at 519. *See also American Trailer Rentals, supra,* 379 U.S. at 616–617, 85 S.Ct. 513.

**65.** *Shlensky supra,* 350 U.S. at 466, 76 S.Ct. at 519.

**66.** The files of Lela were seized by the SEC in early 1974, Affidavit of Tyson, App. at 20, and are apparently now in the custody of the U. S. Attorney for the District of Columbia, Appellant's Br. at 4.

**67.** The determination of "good faith" rests with the District Court in the first instance and should not be set aside unless clearly erroneous. *In re Bermec Corporation,* 445 F.2d 367, 368–69 (2d Cir. 1971). The reason that the brief (three-page) Memorandum of the District Court has been analyzed at such length herein is to demonstrate that the District Court in the fair exercise of his discretion should have found "good faith."

**68.** *See, e. g., In re Equity Co. of America,* 115 F.2d 570 (7th Cir. 1940) (assets of debtor were two adjacent lots with $20,000 in mortgages; debtor's total liabilities exceeded $100,000); *In re Agregados de Manati, Inc.,* 357 F.Supp. 1263 (D.P.R.1973) (solely owned corporation which operated sand and gravel processing plant).

**69.** 6 *Collier on Bankruptcy* § 4.14 at 843 (14th ed.).