## ANNIE E. O'CONNOR ET AL. *v.* MARINA ESTEVEZ AND DANIEL ESTEVEZ

[No. 60, October Term, 1943.]

*Decided December 15, 1943.*

The cause was argued before SLOAN, C. J., DELAPLAINE, COLLINS, MARBURY, MELVIN, ADAMS, and BAILEY, JJ.

*William Curran* and *Paul J. Bailey*, with whom was *A. Kinsley Love* on the brief, for the appellants.

*John F. Mudd*, with whom was *F. DeSales Mudd* on the brief, for the appellees.

MARBURY, J., delivered the opinion of the Court.

This is a bill of complaint filed by a husband and wife against the next of kin and heirs at law, and the administrator of an intestate who died seized and possessed, according to the records, of a farm in Charles County, Maryland, and crops, livestock and farming equipment located thereon. The purpose of the proceeding is to have the court determine the respective rights of the parties in such property. The complainants claim that it was agreed at the time of purchase between them and the decedent, James Leo O'Connor, that they should hold the property in common, that the property was purchased with a considerable contribution of cash made by them, that the mortgages placed thereon at the time of the purchase were paid off largely with the proceeds of the crops raised by them on the farm, and that the buildings on the farm were improved and constructed in part by them and in part by contractors who were given notes which were paid by the proceeds from the farm. The defendants demurred, the demurrer was overruled, and thereupon they answered denying the pertinent allegations of the bill, and alleging that James Leo O'Connor died intestate, seized and possessed of

the real and personal property mentioned in the bill. Testimony was taken on behalf of the complainants only. The chancellor passed a decree that a one-half interest in the property be impressed with a trust in favor of the complainants, directed the conveyance of such interest in the real estate to them, and appointed a trustee to make such conveyance in case of the failure of the defendants to do so. The decree also directed the defendant administrator to pay to the complainants one-half of the personal estate derived from the farm. The theory of the chancellor was that the proof disclosed a situation which warranted him in holding that a constructive trust existed. The defendants contest this, claim there was laches on the part of the complainants in asserting their claim, and error in various rulings of the chancellor on the admissibility of evidence.

The demurrer was properly overruled. The bill alleges an agreement between the decedent and the complainants to purchase the farm, it to be operated and developed by the complainants with financial contributions by the decedent. It then relates the carrying out in part of the agreement by the purchase of the property for $6,200, $2,500 in cash and the balance secured by two mortgages. Title, as agreed, was taken in the name of the decedent, but the property was to be for the mutual benefit of decedent and the complainants as tenants in common. It then relates the cultivation and improvement of the farm by complainants, and the deposit of proceeds from the sale of crops in bank to the credit of the decedent in an account in which he also made deposits. From this account were paid current expenses of the farm, and from this account were liquidated the two mortgages against the property. The court is asked on this statement of facts, to determine that the heirs and administrator of the decedent hold the farm and the personal property thereon for the mutual benefit of decedent and the complainants. This is a good complaint, alleging an express trust. It is not necessary that such a trust be in writing. It must be

evidenced, as to the real estate, by some writing, signed by the party enabled by law to declare such trust. Statute of Frauds, 29 Car. II, Cap. 3, paragraph VII. The evidence does not have to be stated in the bill. *Beachey v. Heiple,* 130 Md. 683, at page 693, 101 A. 553; *Alexander's British Statutes,* Coe's Edition, Vol. 2, page 743, and cases cited. The facts set out in the bill are also sufficient to justify the court in declaring that a constructive trust exists. This does not have to be evidenced by writing. Statute of Frauds, paragraph VIII.

The defendants rely solely on failure of proof. They offered no evidence on their own behalf. They did not cross-examine the witnesses for the complainants. They objected to much of the evidence offered on the ground that it was given by parties to the cause in respect to transactions had with, or statements made by, the intestate, whose administrator and heirs are defendants. They cite as authority for their position Section 3 of Article 35 of the Code of Public General Laws, 1939, which forbids the acceptance of such evidence.

We are not unaware that this and similar statutes in other jurisdictions have been lately much criticized by eminent legal authorities. A notable instance of such criticism is found in *Wigmore on Evidence,* 3rd Ed., Vol. II, paragraphs 578-578a. A committee of the American Bar Association has also recommended its modification. But the statute has been enforced in many decisions of this court, and the doctrine of *stare decisis,* as well as the constitutional limitations on the respective powers of the legislative and judicial branches of our government, forbid us now to change these decisons. If the rule of evidence is to be altered, the General Assembly, and not the courts, will have to indicate in what respect and how.

In considering the evidence admitted over the objection of the defendants, we note the statement of the chancellor, appearing in the record, that whenever a question was objected to, it would be understood that an exception was reserved by the party against whom

an adverse ruling was made. This practice has been recently approved in the case of *Buch v. Hulcher*, 180 Md. 309, at page 314, 23 A. 2d 829. The appellants cannot, however, now stretch this understanding to cover questions to which they made no objection. We have confined our review of the objected evidence to that which clearly appears to have been ruled on by the chancellor. A general objection to all of a certain kind of evidence is too uncertain and indefinite to justify us in considering that it applies to questions and answers which do not otherwise show a ruling by the chancellor. Speaking of such a general objection (exception in that case) this court said: "Under such an exception, the court is not required, and cannot be expected, to go through the testimony and pick out such questions as are objectionable because the witness is incompetent to speak of the subject referred to." *Smith v. Humphreys*, 104 Md. 285, 286, at page 289, 65 A. 57, at page 58; *Russell v. Carmen*, 114 Md. 25, at page 36, 78 A. 903.

The evidence admitted over objection is that of Marina Estevez, one of the plaintiffs. She was permitted to testify that she made the first payment down on the farm of $1,000 to the Strout Agency in New York City; that she had visited the farm before, in company with Mr. Estevez and Mr. O'Connor; that an additional $1,500 was paid at the time the deed was drawn, of which she paid $325, Mr. Estevez paid $405, and Augusta Martinez, a domestic who had then been in her employ for a number of years, contributed $60. A part of the money Mr. O'Connor had borrowed on an insurance policy, and the rest was paid from his salary check. She also testified that Mr. O'Connor, after the purchase of the property, contributed to the support of her family, sending $75 every month for three months of the first year, the second year $60 a month, the fourth year $40 a month, and the rest of the years it has been $30 a month, until September or October, 1940, when he started sending $40 again. She was also permitted to testify that when Mr. O'Connor visited the farm he never paid any

board.  All of this testimony not only has to do with transactions had with Mr. O'Connor by one of the parties to the case, but it concerns the very transaction in suit here.  We think the witness was incompetent to testify to these matters under the previous decisions of this court.  *Martin v. Munroe*, 121 Md. 679, 89 A. 319; *Tillinghast v. Lamp*, 168 Md. 34, 176 A. 629; *Garner v. Garner*, 171 Md. 603, 190 A. 243; *Mays v. Mays*, 176 Md. 159, 4 A. 2d 121; *Dowell v. Dowell*, 177 Md. 370, 9 A. 2d 593, 125 A. L. R. 1008.  The refusal of this court to bar a widow from testifying in a case where there was no personal representative of her husband a party to the case (*Weir v. Baker*, 181 Md. 249, 29 A. 2d 269) is not a relaxation of the rule of the statute, but merely a restriction of it to exactly what the statute says.

This brings us to a consideration of the rest of the evidence, that to which no objection was made, or which was in our opinion properly admitted, over objection. That evidence consists of the remainder of the testimony of Marina Estevez, the testimony of her husband which was not objected to, and the testimony of their married daughter, as well as certain documentary evidence, consisting of the deed to the property, the mortgages, a letter from Mr. O'Connor, and certain notes which were signed by Mr. O'Connor and Mrs. Estevez.

Mrs. Estevez testified that she and her husband, her five sons and her daughter, and a servant came to the farm in Charles County on July 9, 1932.  The family was of Spanish descent, had been in this country twenty-one years, and Mr. Estevez was a naturalized American citizen.  They became acquainted with James Leo O'Connor in the spring of 1908 in New York City, where Mrs. Estevez and another woman ran an apartment house. Her husband was employed there.  Mr. O'Connor had an apartment there.  On August 25, 1932, F. Philip Moran and wife conveyed to Mr. O'Connor, in consideration of $6,200, the two tracts of land in question in this case, located in Charles County, containing about

400 acres, this deed being admitted in evidence without objection. The Estevez family resided continuously on the farm since its purchase. There were two mortgages placed upon the farm, one for $2,700 and one for $1,000, both of which were afterwards paid off. She was asked: "Who settled them; who paid them off?" The counsel for the appellants said: "No objection to that," and the witness answered: "Every time we sold a crop of tobacco; in 1939 we sold a crop and we paid the Cooksey estate"; and then upon being asked by counsel for appellants who she meant by "we," she said: "Well we sold a crop of tobacco, my husband, we sold the tobacco with Mr. O'Connor's permission." Counsel for appellants then objected, but in view of his previous waiver this objection was much too late. The witness then testified that the balance, after paying the mortgage, she put part in the Hughesville Savings Bank, that the money to pay the mortgages off came from the tobacco crops grown on the farm. Two barns have been built on the property and the main building has been renovated, and several other small buildings. This was done by her husband. He was not paid anything for this work by Mr. O'Connor. Her two big sons did the work without being paid anything and her son George also. They hired one man to help. Later her younger son, George, got married, and then he got $40 a month and 5 per cent. of the crops. The money they used to make, they put in Mr. O'Connor's bank account in the Hughesville Bank. The witness identified the deposit book in which she deposited the proceeds and stated that Mr. O'Connor deposited his salary in the same account. He was a salesman for the Revere Copper and Brass Company in New York. Mr. O'Connor visited the farm several times during the year, in the spring, in July during his vacation, between July and December, and he always spent Christmas there. The witness also said that she sold some eggs and sometimes she put the money from the eggs and chickens in the expenses on the farm. She had frequent correspondence by letter with Mr. O'Con-

nor, usually once a week, and a letter from him on January 29, 1933, to her, a few months after the place was bought, was admitted into evidence without objection. This letter is as follows:

"Sunday—1/29/33

"Dear Marina—

"I have your letter and I can understand why you are feeling so bitter. I know that I have not been able to give you anything like what I should and you do not & cannot realize how much pain it causes me to know you are so unhappy. Certainly you do not deserve to be unhappy. But I cannot seem to do any better. You asked me in your letter to advise you how we are going to meet expenses & that is why I referred to the matter.

"I am sending you my salary check for deposit and also your check for February. You will notice that the salary check is reduced 10%. I knew that since before Christmas & it has been worrying me sick but I did not want to tell you or cause you to worry any sooner than I had to. Everybody in our company from the president down was obliged to take a salary cut as our company is in very bad condition. And on top of all of my troubles I had to pay back taxes on the land I own in Baltimore as the authorities threatened to sell the land for taxes unless I paid.

"I am sorry you wrote anything about fixing my property and it hurt me that you should have even thought that because you know it is yours as well as mine and you know that I have been pleading with all of you not to make any repairs that could possibly be put off & urging that we devote all of our efforts for the first year or so towards making conditions better for you. But I know that you too have been suffering & many times we say things we do not mean. I only know that I long with all my heart to get down there & that where there is a will there is a way.

"I have to mail a check to Edelen to pay the interest on the second mortgage and I have forgotten his initials.

Will you kindly look on the papers & advise his intials when you write again.

"Cheer up, Marina, let's hope that better days are coming. Remember, we are in a fight to get better equipped and while the hour just ahead is darkest it is always so just before dawn. Let's continue on fighting to reach the sunshine just beyond the horizon for you & for me.

"Love,

"Jim"

After the house had been fixed, the Winkler Brothers, plumbers at La Plata, were employed to put heat and running water in the house. This cost $1,600, and was paid in notes which were put in evidence without objection. These notes were dated September 1, 1939, were nine in number, each for $50, except the last which was for $65, payable to the order of Bernard R. Winkler, the first one month, the second two months, and the succeeding ones each one month later. All of the notes were under seal and were signed by J. L. O'Connor and Marina Estevez. The witness stated that the notes were paid out of Mr. O'Connor's bank account, in which all of the proceeds from the place and Mr. O'Connor's salary were deposited. On this account Mr. O'Connor drew checks for his personal expenses. There are now about $600, or a little over, debts due on the farm for repairs, lumber for barn, etc. There is some tobacco there still and the checks for this year's crop have been turned over to the administrator by the appellees' attorney.

The next witness was Daniel Estevez, the husband of Marina, who came from Spain, had been in this country twenty years, and was a naturalized American citizen. He knew Mr. James Leo O'Connor very well in New York. Since he came to Maryland he has been working crops, making all the buildings, and making all the fences. He erected a big barn 92 feet long by 32 feet wide. He built the stable and he built the other barn, which was a hipped-roof barn 58x32. The stable

was the same size. On the dwelling house he took off the shingles, put on new sheathing and new roof, put in all new walls inside, put new pillars around the house, made a cellar, this being with the help only of his sons. He charged nothing for that work, was not paid anything by Mr. O'Connor, nor were the boys paid. When the original deposit was made on the purchase price of the farm he put up $405. Before witness came to Southern Maryland he was in the hardware business. He could not tell how long it took him to build the barns and stable, because, as he said, "I make it up by some day today, some day tomorrow; I can not tell you how long I make it, because I thought I was making or working for myself. I make it myself, I take long time because I thought I was working for myself."

Mrs. Moure, married daughter of the appellees, who was not a party to the case, testified that she was about thirteen years old in 1932 when the family moved to Charles County. She lived there until 1940, when she was married, since which time she has lived in La Plata. She knew Mr. James Leo O'Connor very well, recalled the purchase of the farm, and knew a little about the arrangements. She came down to Maryland with her mother at the time they paid the money on the down payment on the farm. She heard the discussions about business, knew what was going on at the farm all the time and knew the correspondence. She remembered when Mr. and Mrs. Estevez and Mr. O'Connor came back to New York after they had been down to look at the farm the first time. She heard them say that conditions in the city were bad for young children, that if they went into any other business it would probably be a failure also, and they thought that just at that time of the depression the best place was to buy a farm and then do the best they could on it. She does not recall the exact words. She knew they had been in business together before. All the business had been done together, and they intended to buy the place together. She heard that among them speaking of buying

the place together. She was in the same room and overheard their conversation. When they moved on the farm, the condition was deplorable. Her father built two large barns and a stable, fixed the main house over, remodeled the house on the inside, did plastering and papering, built a cellar under the house, and other small buildings on the farm like chicken houses, and built fences. He worked on the farm continuously, was there every day for years, did the construction work himself, the only help he had was that of the brothers of the witness. Her mother helped to clean the yard, supervise the farming and kept the boys working and raised poultry. Mr. O'Connor came down almost any time there was a holiday and during his vacation every year. He didn't come there as a boarder, he was just like a member of the family. He was just like an uncle to the children. She heard Mr. O'Connor make statements about the ownership of the farm on different occasions when he would come down. He and her father and mother spoke of the condition of the farm and when they expected to pay the mortgages off. She heard Mr. O'Connor say that as soon as the place was paid for, he intended to deed the place so that both would be protected by law. The witness said in answer to questions by the court, that she heard it several times, and she can recall it so well because she was working for a lawyer at the time, and she could see that so much could happen. She had spoken to Mr. O'Connor personally because she felt that her mother should have had some protection. He always said that he wanted to do it, but he always felt that the place should be theirs before they could divide it the way they wanted to divide it. She spoke to Mr. O'Connor about this several times, and once, the time before the last he had come down. He told her then that in April, 1940, he thought they would be all finished with the bills, that they would fix the deed then. Mr. O'Connor died in 1942. The mortgages were paid off in 1939 and 1940. After this witness had testified Mrs. Estevez was recalled to show just when the

mortgages were released. The second mortgage to the Cooksey estate was paid and released May 29, 1939, by a check for $1,135.40, representing accrued interest to date. The balance on the Hughesville Bank mortgage, which was the first mortgage, was paid on the 5th of July, 1940.

This testimony paints a picture of three people who had been in business together in New York and who, in the midst of the depression, desired to buy a farm. They came down together and looked at the farm, it was bought, the title was put in O'Connor's name, but at least four hundred and some dollars of the cash payment was made by Mr. Estevez and he then went to work on the farm. He not only raised crops, he renovated the house, built two barns and a stable, and other buildings, and the proceeds of his work all went into an account in Mr. O'Connor's name in the Hughesville Bank, and from this account, which was augmented by Mr. O'Connor's salary checks, the mortgages were paid. When the time came to put water and heat in the house, notes were signed by Mr. O'Connor and Mrs. Estevez and these were also paid off from this account. The Estevez family were obviously not tenants, they got no share of the crop, and it is hardly likely they would have worked for nothing, either in raising the crops to pay off the indebtedness, or in repairing and constructing the buildings on the farm. A tenant does not ordinarily sign notes for improvements on a dwelling, yet that is what Mrs. Estevez did. The reasonable explanation is the one given by Mr. Estevez, that he thought he was working for himself. The oral agreement and the admissions testified to by Mrs. Moure, as well as those in Mr. O'Connor's letter, show clearly why these persons all acted as they did. Their actions cannot be explained on any other hypothesis.

The appellants say that the appellees are guilty of laches. They do not base this upon any delay after Mr. O'Connor's death, but they say it is unfair to have such a claim asserted against his estate when he can no longer

testify, and when it has been eleven years since the farm was purchased. The parties to this transaction apparently were on the most friendly basis. The daughter said that Mr. O'Connor had promised he would convey the property after the mortgages were paid off. That has been only two years ago, and it could hardly be expected that the appellees would rush into court to compel a friend of theirs, in whom they apparently had the greatest confidence, to do something which he was seemingly willing to do. There is nothing to show that he ever declined, or gave any indication that he was not going to carry out what he had said he would do. The appellees could not be expected to anticipate his death. We are unable to find any laches on their part.

The evidence, as we have shown, is entirely uncontradicted. The witnesses were not even cross-examined, and there is nothing in the record to indicate that they were not telling the truth. On the contrary, the chancellor stated in his opinion that he was impressed with their sincerity, forthrightness, and complete honesty. The question, therefore, is, what is the situation shown by this testimony. There was an oral agreement of some sort of a joint venture between the parties, and in the absence of any evidence of any other division, it may be assumed that the two sides to the agreement, namely, Mr. O'Connor and the Estevez family, were equal partners or associates. Oral testimony, however, is not sufficient to establish an express trust under the Statute of Frauds. The letter, which is the only writing signed by Mr. O'Connor in evidence, contains an admission that the property belongs to Mrs. Estevez as well as to him. But it contains nothing definite and we are unable to view it as evidence of any agreement which would be sufficient to create an express trust in favor of the appellees.

There are several classes of implied trusts, one of which is that known as a resulting trust. This arises when the title is taken in the name of one party, but the money for the purchase is furnished by another. In

such case the title owner holds the property for the benefit of the party who paid the purchase price. However, in such cases, it is a rule of long standing that the purchase price must be paid at or before the time of purchase, and this must be shown by plain, direct and unequivocal evidence. *Vogel v. Vogel,* 157 Md. 147, 145 A. 370, and cases there cited. The properly admitted evidence in this case does not measure up to that standard, not does it show that any but a small part of the purchase price was paid at the time of the purchase of the property by the appellees. We can not, therefore, find that there is any resulting trust.

There are other implied trusts, however, which arise by operation of equity. These trusts are known as constructive trusts. They are declared to exist where property has been acquired by fraud or some other improper method, or where the circumstances render it inequitable for the party holding the title to retain it. A full discussion of this class of trusts will be found in the cases of *Springer v. Springer,* 144 Md. 465, 125 A. 162; and *Lipp v. Lipp,* 158 Md. 207, 148 A. 531. There is no question of fraud or of any circumstances amounting to constructive fraud, in the case before us, but the facts and circumstances do show a situation in which it would be inequitable to permit the O'Connor heirs to retain title to the entire property. The greater part of the purchase price was paid off by the labor of the appellees, and they greatly improved the property by the building operations they conducted upon it. They did this on the strength of a parol agreement which cannot be enforced as such, but which is strong evidence of the reason for their acting as they did. Under these facts the O'Connor heirs cannot rest on their legal title, and deprive the appellees of the fruits of their labor. The parol agreement under which they operated was amply sufficient to justify what they did. It was the kind of loose, not too clearly defined, arrangement which freinds often enter into without considering the situation in which they may find themselves when death

556

intervenes. Nevertheless courts of equity recognize such an agreement as a basis or foundation for the establishment of a trust over property for the benefit of those who may have an interest in it, not protected by a legal title. The present case is a proper case for the exercise of such equitable relief. It was so found by the chancellor, and we agree with his conclusion, although we have not considered all the evidence he had before him.

Each side, we think, should pay their own costs, in view of the fact that the appellants had no evidence to present to oppose the claim of the appellees, but required the latter to prove it before accepting it. This was an entirely reasonable position for them to take, and under the circumstances we do not think they should pay more than their share of the costs.

*Decree affirmed, each side to pay their own costs.*