CARTER *v.* ABRAMO, ET AL .
[No. 61, October Term, 1952.]

*Decided January 9, 1953.*

The cause was argued before DELAPLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Hyman Ginsberg,* with whom were *Ginsberg and Ginsberg* on the brief, for appellant.

*Kenneth C. Proctor* and *J. Nicholas Shriver, Jr.,* with whom were *Cross and Shriver* on the brief, for appellees.

DELAPLAINE, J., delivered the opinion of the Court.

This suit was brought in the Circuit Court for Baltimore County by Charles A. Abramo, Elwood C. Hewitt and Charles E. Wingo, of Cockeysville, to impress a constructive trust upon 3,250 shares of the capital stock of Molded Products, Inc., held by Wilfred S. Carter, an attorney, of Chevy Chase.

In November, 1947, complainants, defendant and Rees D. Stephens, of Washington, an agent for manufacturers, formed a Maryland corporation under the name of Plymold Corporation of America, later changed to Molded Products, Inc., for the purpose of manufacturing plywood products. It was mutually understood that complainants were to work in the factory at Cockeysville, while defendant and Stephens were to act as promoters. The corporation issued 10,000 shares of capital stock with par value of $1 each. Defendant and Stephens each subscribed to 3,250 shares, each paying $3,250 in cash. Hewitt subscribed to 1,500 shares, paying $750 in cash and consenting to deductions from his wages for the remaining $750. Abramo subscribed to 1,500 shares, and Wingo to 500 shares, each consenting to

deductions from their wages. Stephens was elected president of the corporation.

In February, 1948, Stephens, becoming disgusted with defendant, resigned as president and offered his stock for sale. Shortly afterwards defendant expressed the opinion that Stephens would find difficulty in selling his stock, as no investor would want to become a minority stockholder in a small business with which he was not familiar. Stephens, getting no satisfactory reply from complainants, offered his stock to O. H. Williamson, the company's landlord and supplier of materials. Abramo and Hewitt had no objection to the sale of the stock to Williamson, but defendant suggested that he and the complainants ought to buy the stock and divide it into four parts. Complainants accordingly delegated him to confer with Stephens to ascertain his price. Abramo, in explaining why defendant was chosen to negotiate with Stephens, testified as follows: "Mr. Carter was closer to Mr. Stephens. * * * He was the legal man. He knew how to handle those matters. He was a lawyer. So he was elected to do that job."

Defendant conferred with Stephens in Washington without delay, and on the following day returned to Cockeysville with a report that Stephens was willing to sell his 3,250 shares of stock at $1.20 per share, totaling $3,900. Hewitt said he could make a partial payment of $500, and Abramo and Wingo said they could make their payments later. Complainants testified that they entered into an agreement with defendant that he would make settlement for the stock, and when they reimbursed him, the stock would be split into four parts. They testified that defendant returned to Washington and talked with Stephens again, and several days later he informed them that he had purchased the stock for $3,900.

Hewitt testified that, after he had finished paying for the stock issued to him in 1947, he saved enough money to pay for his share of the stock bought from Stephens. He asserted that he as well as Abramo and

Wingo were ready to pay for their respective shares about January 1, 1949, but that defendant always gave an evasive answer when he was asked to divide the stock. In November, 1950, when defendant was president of the corporation, Hewitt called a directors' meeting, mentioning in the notice that one of the subjects to be considered would be the demand of Abramo and Wingo for their stock. According to complainants, defendant asserted at the meeting that he would not divide the stock until he was repaid certain money which the company owed him.

In August, 1951, defendant called a meeting of stockholders. Shortly before the meeting he asked Stephens to give him a proxy for the 3,250 shares, which Stephens had sold but which defendant had not yet transferred. Stephens informed him that he had already given a proxy authorizing all four men to vote the shares. At the stockholders' meeting Abramo, Wingo and Hewitt were elected directors. Immediately afterwards they held a meeting of the board of directors, at which defendant was removed as president. Abramo was elected president, Wingo vice president, and Hewitt secretary and treasurer. The next step was a peremptory demand upon defendant to divide the stock in compliance with the agreement. As he refused to do so, complainants filed this suit.

The chancellor believed complainants were telling the truth, and found that the evidence was sufficiently clear and convincing to warrant the imposition of a constructive trust. He accordingly entered a decree declaring the certificate for 3,250 shares of capital stock of Molded Products, Inc., in the name of Stephens to be the property of complainants and defendant; and that when complainants make *pro rata* reimbursement to defendant at the rate of $1.20 per share, defendant shall surrender the stock certificate, and the corporation shall issue four certificates of stock, each for 812½ shares, to complainants and defendant. Defendant appealed from that decree.

A constructive trust is imposed where a person holding title to property is subject to an equitable duty to convey it to another person on the ground that he would be unjustly enriched if he were permitted to retain it. The duty to convey the property may arise because it was acquired through fraud, duress, undue influence, or mistake, or through a breach of fiduciary duty, or through wrongful disposition of another's property. *Springer v. Springer*, 144 Md. 465, 125 A. 162; *Lipp v. Lipp*, 158 Md. 207, 148 A. 531; *O'Connor v. Estevez*, 182 Md. 541, 555, 35 A. 2d 148; *Trossbach v. Trossbach*, 185 Md. 47, 42 A. 2d 905; *Fasman v. Pottashnick*, 188 Md. 105, 51 A. 2d 664. The equity court imposes a constructive trust upon either real or personal property by parol evidence on the ground of public policy under the equitable doctrine that the Statute of Frauds, which was enacted for the purpose of preventing fraud, should not operate as a shield for the perpetration of fraud. *Soehnlein v. Pumphrey*, 183 Md. 334, 37 A. 2d 843.

Generally, a grantee will not be considered a trustee *ex maleficio* merely because he failed to carry out an agreement. However, where property is conveyed to a person upon his oral promise to hold it and later reconvey it to others, and at the time of the conveyance he stands in a confidential relation to the others, a court of equity will not allow him to keep the property and be unjustly enriched, but will compel him to transfer the title to the parties equitably entitled to it, even though he may have intended at the time of the conveyance to carry out the agreement, and even though he was not guilty of fraud, undue influence, or any other abuse of the confidential relation in procuring the conveyance. Confidential relation exists in cases of attorney and client, principal and agent, guardian and ward, and wherever confidence is reposed by one person and accepted by another. *Grimes v. Grimes*, 184 Md. 59, 40 A. 2d 58; *Rice v. Rice*, 184 Md. 403, 41 A. 2d 371.

The present case was instituted by three associates in a small manufacturing company, who entrusted an-

other associate, who is a lawyer, with work of a fiduciary nature. It is a clear case of a confidential relationship. Moreover, the proof of the agreement is clear and definite. Complainants testified that they authorized their attorney to negotiate for the purchase of 3,250 shares of the capital stock of their corporation from Stephens, and he informed them soon afterwards that he had purchased the stock. They testified that it was definitely agreed that the stock was to be divided into four parts. They also testified that they asked defendant on several occasions to divide the stock as he agreed to do, but each time he put them off, although he could not deny the existence of the agreement. They further testified that they told him early in 1949 that they had the money available to pay for their shares. Hewitt, when asked on the witness stand what defendant's response was, testified: "It was that there was no rush on the stock. It was always an evasive answer, that the stock could be taken care. of at a later date."

The story of complainants has all the earmarks of truth. Miss Ellen Elizabeth Huffard, Hewitt's secretary in the office of the company, testified that she had often heard Hewitt and Abramo discussing the agreement that had been made for the purchase of the stock from Stephens. She also recalled an occasion when Abramo was discussing the stock with defendant, and Abramo angrily called defendant a welsher.

Stephens testified that defendant told him in February, 1948, that he and his associates had agreed to buy his stock; that one of them had advanced $500, while he himself was ready to advance $1,000; and that, when all of them had paid for the stock in full, he would "divide it up equally among the boys." Stephens further testified that defendant told him in August, 1951, that the stock had not yet been divided because "the boys didn't have the money to pay for it."

G. Milton Brooks, vice president of the National Bank of Cockeysville, also corroborated the testimony of complainants. He recalled that defendant had told

him on one occasion in October, 1948, when he came to the bank to make an application for a loan, that the stock he had bought from Stephens would be divided among his three associates and himself.

Defendant, however, swore positively that he had never entered into any agreement to divide the stock. When he was asked on cross-examination whether he recalled any of these conversations with complainants and their witnesses, he replied: "It was a complete surprise to me when I received a letter from you making demand upon me. * * * I said there was never any demand on me to transfer the majority of the stock to them."

The chancellor declared that he considered it his duty to say that he was convinced that defendant was not telling the truth but was deliberately attempting to defraud his associates. We see no reason to disagree with the chancellor's conclusion.

As the evidence in this case clearly warrants the imposition of a constructive trust, the decree of the chancellor will be affirmed.

*Decree affirmed, with costs.*