DOVE *v.* WHITE ET AL.

[No. 13, October Term, 1956.]

230

*Decided November 13, 1956.*

The cause was argued before Brune, C. J., and Collins, Henderson and Hammond, JJ., and Henderson, J., Chief Judge of the Fourth Judicial Circuit, specially assigned.

*R. Edwin Brown,* with whom was *John E. Oxley* on the brief, for the appellant.

*Clitus O. Bourdeaux* for the appellees.

HAMMOND, J., delivered the opinion of the Court.

Mrs. Ara Dove, claiming beneficial ownership of a house in Montgomery County in which she has lived for almost twenty years, although record title has been in another, sought a declaration that she was the owner of the house and conveyance to her of the legal title. The appeal is from the Chancellor's dismissal of her bill of complaint.

In 1936 Mr. Dove deserted his family. Mrs. Dove wished to acquire the house which is the subject of controversy for herself and her seven children. She asked an old family friend, Rodney White, to look into the matter for her. He did so. It was bought for a $25.00 deposit, with the balance of the purchase price of $2,200.00 paid by two mortgages, one of $2,000.00 to a building association and the other for $200.00 to the owner. Mr. White was separated from his wife. There arose the question in whose name title to the house should be put. Mrs. Dove felt that it could not be put in her name because, if this were done, her husband would have an interest in the property and would have to join in the mortgages, and Mr. White's marital status posed the same problem. Testimony produced for Mrs. Dove is to the effect that Mr. White suggested that his unmarried sister, Amy White, might be a good person to hold title for Mrs. Dove, that he approached the sister and that she agreed, provided she would be put to no expense or obligation, and that, thereupon, Mrs. Dove paid the $25.00 deposit and, over the years, the principal and interest of the two mortgages which were put on the house and signed by Amy White. It was testified that Mrs. Dove paid the taxes and insurance and the cost of repairs and improvements. In 1953 Rodney White died suddenly and the house was immediately claimed on the one hand by his children and, on the other hand, by Mrs. Dove. Amy White has never claimed any beneficial interest in the property and admittedly held it as trustee. After somewhat prolonged and seemingly unhappy indecision, she deeded the property to her brother's children, and Mrs. Dove filed suit against her and the children, seeking to be declared the beneficial owner of the house and to have it conveyed to her. She has appealed from the Chancellor's holding that testimony

232

produced in her behalf did not meet the burden of proof imposed upon her to show that she was the *cestui que trust* and his dismissal of her bill of complaint.

The appellant says that a constructive trust has been shown. The appellees agree that if any trust exists for the benefit of appellant, it is a constructive trust, not a resulting trust as to which there is lacking an essential element, payment of the purchase price at or before the time of purchase, and not an express trust for there is no writing to gratify the statute of frauds. We agree that there is not a resulting trust for the reason urged. *Dixon v. Dixon,* 123 Md. 44; *Springer v. Springer,* 144 Md. 465, 477; *O'Connor v. Estevez,* 182 Md. 541. We turn then to whether there is either a constructive trust or an express trust.

In England it was held that the statute of frauds was enacted to prevent, not to protect, fraud and that consequently a constructive trust would be imposed when it would be a fraud or give rise to unjust enrichment to deny the oral trust and claim the land. *Scott, Trusts,* Second Ed., Vol. 1, Sec. 44, p. 309. The rule in the United States has been said to be narrower. *Trossbach v. Trossbach,* 185 Md. 47, 51. In this country when land is conveyed upon an oral trust, a constructive trust arises if the conveyance was procured by fraud, or otherwise wrongfully, or the transferee was in a confidential relationship to the transferor, or if the transfer was made as security. In cases of confidential relations the result under the rule in the United States would seem to be as broad as the result under the English rule. Maryland has seen the true rule to be even broader than the English rule for this Court has held, as the sole basis for decision, that a constructive trust arises under any circumstances which render it inequitable for the holder of the legal title to retain it. *O'Connor v. Estevez,* 182 Md. 541, 555, *supra.* The law is said to be, in *Restatement, Trusts,* Sec. 44, and *Restitution,* Sec. 182, that a constructive trust arises if (a) the transfer was procured by fraud or other wrongful act; or (b) if the transferee was in a confidential relation to the transferor; or (c) if the transfer was made as security for an indebtedness of the transferor. The Institute takes no position upon whether the trans-

feree holds upon a constructive trust where he orally agreed to hold in trust for the transferor, except under those circumstances. It is suggested in *Restatement, Trusts,* Sec. 44, Comment c, in discussing confidential relations, that they exist where "* * * the transferor is in fact accustomed to be guided by the judgment of the transferee or is justified in placing confidence in the belief that the transferee will act in the interest of the transferor * * *." The comment adds that "It might seem, indeed, that wherever the transferee orally agrees to hold the property transferred to him in trust for the transferor there is a sufficient relation of confidence thereby created to justify imposing a constructive trust upon him if he breaks his promise * * *."

*Scott, Trusts,* Second Ed., Vol. 1, Sec. 44, p. 314, takes the same view, saying: "It would seem, therefore, that where land is transferred upon an oral trust for the transferor, the policy of the statute should not forbid evidence of the oral trust for the purpose, not of enforcing the trust, but of preventing unjust enrichment by restoring the status quo. * * * The letter and the spirit of the Statute of Frauds are sufficiently adhered to by refusing to enforce the oral trust or contract as such, and neither the letter nor the spirit of the statute should prevent oral evidence for the purpose of placing the parties in statu quo."

In *O'Connor v. Estevez,* 182 Md. 541, 555, *supra,* the Court found no fraud or constructive fraud and made no finding, or indeed mention, of confidential relations, but held that a constructive trust arose because the facts and circumstances showed a situation such as to "* * * render it inequitable for the party holding the title to retain it." The Court relied on *Springer v. Springer,* 144 Md. 465, where there was no finding—although perhaps an assumption—that confidential relations existed and where the rule was stated to be as broad as that relied on in *O'Connor v. Estevez.* In *Trossbach v. Trossbach,* 185 Md. 47, *supra,* Judge Markell, for the Court, set forth the English rule and the rule in this country, as we have discussed them, and found it unnecessary to decide the correctness of the suggestion of the *Restatement, Trusts,* and of *Scott on Trusts* that every conveyance on an oral trust

shows a confidential relation. In *Fasman v. Pottashnick,* 188 Md. 105, the Court found no facts sufficient to establish a constructive trust but gave this negative statement of the law: "We find in this case no actual fraud, or any circumstance amounting to constructive fraud, or any facts and circumstances that produce a situation where it would be inequitable to allow Rosen's heirs or devisees to retain title to the properties in question." The opinions in *Carter v. Abramo,* 201 Md. 339, 343, and *Nowell v. Larrimore,* 205 Md. 613, 621, although they do not flatly so hold, suggest that the rule in this State may be as broad as *O'Connor v. Estevez* and *Springer v. Springer* stated it to be. The evidence before us would seem to support a finding that Mrs. Dove was accustomed to be guided by Rodney White's judgment and had the fullest confidence that he would act in her interest only. Such a finding would gratify the suggested definition of a confidential relationship set out in *Restatement, Trusts,* Sec. 44, Comment c, as well as that set out in *Grimes v. Grimes,* 184 Md. 59, 63, and *Carter v. Abramo,* 201 Md. 339, 343, *supra,* that a confidential relation exists in every case where "* * * confidence is reposed by one person and accepted by the other." If the confidential relation does exist, and it would be inequitable for the holder of the title to retain it, the right to reconveyance is not affected by the fact that the trustee may have intended at the time of the original conveyance to keep the agreement and was not guilty of any abuse of confidential relations in procuring the conveyance. *Grimes v. Grimes,* and *Carter v. Abramo,* cited just above, so hold.

As we read the record, there is posed directly a basis for decision, to be discussed later, which makes it unnecessary to determine whether or not there was a confidential relationship or whether, absent such a relationship, the rule of *O'Connor v. Estevez* that the facts make it inequitable to deprive Mrs. Dove of the property, is applicable and controlling. The same reason makes it unnecessary also to pass on appellees' contention in this Court that even if the parol evidence showed an express trust, the statute of frauds would prevent the trust from being operative. If this point had to be decided, it might well be doubtful whether the appellees could raise that

defense for the first time in this Court, having conceded below that Amy White was a trustee for someone and, having failed to either plead the statute of frauds or to object to parol evidence as to the trust, on the basis that it offended the statute. The statute of frauds does not make an oral trust as to land unlawful or void; it requires that it be proved by a writing and this requirement of proof may be waived and the defense put upon the merits of the case. *Lingan v. Henderson,* 1 Bland 236, 248; *Miller, Equity Procedure,* Sec. 253, p. 316. An early rule of chancery pleading in Maryland was that if the respondent admitted the oral contract or agreement relied on by the complainant, but also set up the statute as a defense, there was no waiver. *Hamilton v. Jones,* 3 Gill & J. 127, 132, 133. It was also an early principle of Maryland chancery pleading that if the respondent completely denied the parol agreement or contract but did not plead or rely on the statute, the general denial was enough to compel the complainant to meet the requirements of the statute. *Billingslea v. Ward,* 33 Md. 48, 51; *Semmes v. Worthington,* 38 Md. 298, 317. The rule elsewhere is not so restricted. *Scott, Trusts,* Second Ed., Vol. 1, Sec. 44, p. 315, says that the better holdings are that failure to plead the statute of frauds waives the defense. See, in confirmation of Scott's views, 2 *Corbin on Contracts,* Secs. 317, and 320. *Abalan v. Abalan* (Mass.), 107 N. E. 2d 302, is an example of the cases applying the better rule mentioned by Scott. There the Court said: "The defendant does not set up the statute of frauds * * * and therefore cannot rely upon it. * * * If by any form of trust or contract she was obligated to reconvey the property, she cannot complain of the decree. The only question is whether there was such an obligation."

Some courts hold that despite failure to plead the statute a defendant nevertheless can take advantage of it by objecting to any testimony, the purpose of which is to prove orally what the statute says must be proved by a writing. 2 *Corbin on Contracts,* Sec. 319, and cases cited. Professor Corbin says in the same section that the Court will not raise the question of its own motion and that "It is universally held that the question cannot be raised for the first time on appeal." This

Court has shown a trend towards the views of Scott and Corbin. In *Trossbach v. Trossbach,* 185 Md. 47, it was held that it was not necessary to determine whether a constructive trust arose since the alleged trustee in his testimony had admitted the general tenor of the agreement relied on by the complainant, although claiming certain variations. The Court decided that the statute of frauds required no more and refused to follow the earlier decisions that an admission in the answer was not enough if the statute was pleaded and relied on, as it was in the *Trossbach* case. Judge Markell, for the Court, noted that the statute of frauds does not provide that a trust as to land must be constituted by a writing but merely that it must be proven by some writing, and that this requirement may be waived. In *J. A. Laporte Corp. v. Pennsylvania Dixie Cement Corp.,* 164 Md. 642, it was held that an objection that the contract in suit was unenforceable under the statute of frauds made for the first time on appeal could not then be relied on because the statute had not been pleaded below, nor had objection been made to the proof of the contract on the ground of the statute, although the defendant had pleaded the general issue and had asked for a directed verdict for lack of legally sufficient evidence as to the contract. On a motion for reargument, it was noted that there had come to the attention of the Court the case of *Hamilton v. Thirston,* 93 Md. 213, 220, a suit at law on an alleged oral agreement by an uncle to devise a portion of his estate, consisting of real and personal property, to a nephew in consideration of certain services to be rendered. The Court, in denying the nephew's claim, said: "The Statute of Frauds was not set up by plea in this case but the making of the alleged contract was categorically denied by the first plea and that was sufficient either at law or in equity to entitle the defendant to rely upon it as a defense. *Billingslea v. Ward,* 33 Md. 48; *Semmes v. Worthington,* 38 Md. 317; * * *." The cases cited are the equity cases to which we referred earlier, holding that the statute could be relied upon, although not pleaded. The Court in the *Laporte* case denied the motion for reargument, refusing to follow *Hamilton v. Thirston.* It said that without reference to that case: "* * * we should have regarded the objection to enforcement

of a contract for want of writing as an objection to form which would be raised too late on the appeal after a full trial on the merits. That is the view taken in the great majority of other jurisdictions; the contracts referred to in the statute are not void, but only voidable at the option of the party sought to be charged, and the option is viewed as exercised by acceptance of the oral contract if the trial is gone through with and verdict taken on the assumption that the oral contract is sufficient." The Court held finally: "* * * we have concluded that the decision previously rendered here should not now be recalled, and that the objection should remain classed as one of those which cannot be raised for the first time on appeal."

The case before us was tried below with each side claiming that it was the beneficiary of an oral trust. It was conceded by the appellees that Amy White had never had, and did not now have, any claim of beneficial interest in the property. She so testified. It seems plain that Amy White did not know who really was the beneficial owner of the house. Acceding to the importunities of her nephews and nieces, she finally signed a deed conveying the house to them and sent it to their lawyer. Besieged by doubt, she reclaimed the deed and for some months would not allow it to be recorded. Neither by demurrer nor by answer did either Amy White or Rodney White's children set up the statute of frauds as a defense, nor did they object to testimony on the basis of the statute.

It may well be that the holdings in *Trossbach v. Trossbach* and *J. A. Laporte Corp. v. Pennsylvania Dixie Cement Corp.* leave the only question now to be decided by this Court to be the sufficiency of the parol evidence produced on Mrs. Dove's behalf to prove that she was the beneficial owner, since below the appellees admitted a trust and neither pleaded nor otherwise relied on the statute of frauds.

We have concluded, however, as we have noted, that this point need not be decided. The record presents directly, and we think inescapably, whether there was not such performance by Mrs. Dove of her part of the agreement, under which she seeks legal title, as to take the case out of the statute of frauds. *Restatement, Trusts,* Sec. 50, declares the law to be that: "Al-

though a trust of an interest in land is orally declared and no memorandum is signed, the trust is enforceable if, with the consent of the trustee, the beneficiary as such enters into possession of the land or makes valuable improvements thereon or irrevocably changes his position in reliance upon the trust." There are Maryland cases in accord with the rule stated. See *Brooks v. Dent*, 1 Md. Ch. 523, 526; *Whitridge v. Parkhurst*, 20 Md. 62, 85. Comment e of Section 50 says: "The rule stated in this Section is similar to the rule under which oral gifts of land or contracts for the sale of land become enforceable on the ground of 'part performance.' " There are numerous Maryland cases holding that an oral gift of land will be enforceable if there has been part performance. *Hardesty v. Richardson*, 44 Md. 617, 624. There a father had given land to a son and the Court held that while proof must be clear, definite and conclusive as to the fact of the gift, and those acts done on the faith of it which render inequitable any attempt to avoid the gift, clear proof of the taking of possession and the making of improvements on the strength of the gift was sufficient. It was noted that the Court in such cases relies not so much on the contract, which falls within the statute of frauds, as on the acts done under it subsequently, on the faith that the promise will be performed by the other party. There are similar holdings in *Haines v. Haines*, 6 Md. 435; *Whitaker v. McDaniel*, 113 Md. 388; *Chamberlain v. Preston*, 170 Md. 1; *Jaworski v. Jaworski*, 202 Md. 1; and cf. *Withers v. Douglas*, 206 Md. 141.

. There are many Maryland cases holding that specific performance of an oral contract to sell or lease land will be granted if there has been part performance. In *Hall v. Sharp Street Station*, 155 Md. 654, the bill, challenged by demurrer, alleged an oral contract by the respondent to lease a lot of ground for ten years, as well as complainant's entry thereon with respondent's consent, and his construction thereon of a building as provided in the contract and his continued occupancy of the premises for six years, with payment of rent. The Court said that these open, definite and manifest acts were done while in possession and solely pursuant to and in the performance of the particular agreement, and that the al-

legations of the complainant entitled him to specific perform-
ance. In *Schluderberg v. Dietz,* 156 Md. 547, an oral agree-
ment to lease was required to be specifically performed by the
lessor on the strength of performance by the lessee. The
Court said: "The taking of the possession of the whole prop-
erty, tender and acceptance of the rent and, with the privity
of the owners, the painting and whitewashing of the store-
room, were all acts 'unequivocally referring to, and resulting
from, the agreement.' * * * The delivery of the possession
of the entire property, and the payment of rent therefor, show
that some contract had been made between the owners and
the party in possession; and these conditions are admissible
as acts of part performance taking the case out of the Statute
of Frauds." In *Buckner v. Jones,* 159 Md. 679, a contract for
the purchase of property was specifically enforced when the
evidence showed that the complainants had gone into the prop-
erty under an oral contract of purchase at a price to be paid
in monthly installments and not as lessees paying a monthly
rent, and had occupied the property for years and had made
the payments, since this was sufficient part performance for a
decree, notwithstanding the statute. *Serio v. Von Nordeck,*
189 Md. 388, is a late case applying the same rule. There
Judge Markell, for the Court, pointed out that payment of a
part, or even the whole, of the purchase money is not an act
of part performance which alone will take a parol contract
out of the statute of frauds, but went on to note that payment
of the purchase money, plus continued possession, may be
enough. The Court held that the complainant's possession
and repairs or improvements made at the cost of some
$2,000.00 were all acts unequivocally referring to and resulting
from an oral agreement for the sale of the property to the
complainants and held that the contract could be specifically
enforced. See also *Soehnlein v. Pumphrey,* 183 Md. 334.
There Judge Delaplaine, for the Court, said: "Likewise, con-
tinued possession of property in pursuance of a contract
of sale together with payment by the purchaser of all or a
part of the purchase price constitute part performance suffi-
cient to take the case out of the operation of the Statute of
Frauds. * * * an oral contract will not be enforced unless the

acts of part performance are proved by clear and satisfactory evidence, and refer unequivocally to the particular agreement alleged in the bill." See *Pomeroy, Specific Performance of Contracts,* Third Ed., Secs. 116-123.

The appellees' main reliance throughout the case has been that Mrs. Dove's evidence was insufficient and inadequate to meet with necessary clarity, force and precision, the burden borne by her, on any theory, to prove that she was the beneficial owner of the house. It is conceded that Mrs. Dove was not a tenant. For reasons that are discussed later, we think that she did not live in the house by sufferance, or as the guest of Rodney White. If the evidence as to the acts of performance is clear and satisfactory and refers unequivocally to and results from the oral agreement relied on by Mrs. Dove, she is the legal owner of the property and entitled to a deed.

In addition to the limited testimony she could give under the restrictions of Code, 1951, Art. 35, Sec. 3, Mrs. Dove produced testimony that she bought and paid for the house, as well as for the repairs and capital improvements, and the insurance and taxes, from six of her children, a son-in-law, a niece and a friend. The appellees challenge the reliability of all of the evidence. They say that most of the witnesses have a pecuniary interest in the outcome of the case since the loss of her home would bring about or increase the need of their contributing to Mrs. Dove's support, and that the remaining witnesses are biased. The testimony of all of the witnesses is said to be subject to the infirmity of vague recollection and imperfect expression of conversations or admissions recounted, as well as fraught with the danger referred to by Chancellor Kent and quoted in *Greer v. Baughman,* 13 Md. 257, 268, where it was said that parol proof of trusts of real estate tends "* * * to perjury and the insecurity of paper title." Appellees do not so phrase it but the essence of their contentions seems to be, as Judge Burke put it for the Court in *Dixon v. Dixon,* 123 Md. 44, 54, that the record exhibits "the greed of some parties, the delusions of self-interest and partisanship, and a melancholy perversion of truth on the part of some witnesses."

The Chancellor did not see or hear the witnesses. He decided the case from the record, as we must. He stressed the

language from the cases—mostly, if not all, cases of resulting trusts—that parol evidence, particularly from those with interests or bias, should be received with the greatest caution, impeaching as it does solemn instruments, the evidence of title to land, and that evidence of oral trusts should be clear and convincing, and that Mrs. Dove's evidence did not meet this standard.

Here the only pertinent solemn instrument, the deed to Amy White, concededly does not reflect the true beneficial ownership. Nevertheless, in the posture the case comes to us, the evidence to show that true beneficial interest must be clear, satisfactory and convincing. Our reading of it leads us to disagree with the appellees that the testimony of Mrs. Dove's witnesses is to be rejected as inherently untrustworthy or not to be believed, and with the Chancellor, that on the whole it was not clear and convincing.

The witnesses did not repeat in parrot-like phrases essential facts to be proved. Some testified as to some part of the story, some as to others. We see nothing in the record to indicate that their testimony was not truthful and we find it, in toto, to have painted a clear and credible picture.

Taking the story chronologically, it was shown in support of Mrs. Dove's claim that the Rodney White family and the Dove family had a close relationship. Mr. White and Mr. Dove had been the best of friends. The Dove children thought of and called Mr. White "Uncle Rodney". One of the Dove children lent him $1,000.00 for his business needs. After Mr. Dove deserted his family and they were obliged to move from their home into a rented four room house, Mrs. Dove, with a large brood of children, was very desirous of acquiring the security of a home adequate to house the family. Mr. Rodney White shared Mrs. Dove's views as to her acquiring a home. As Mrs. Vaughn, a friend of Mrs. Dove's, testified: "He was always after her to secure a home. * * * He felt she was wasting money with rent * * * and that because of her family she should have a home—security." Mrs. Vaughn testified further that because of the marital difficulties of Mr. and Mrs. Dove and Mr. and Mrs. White, neither could take title to the property. "It would be up to someone else to hold the title to the

property * * * it was suggested that Amy White might be a very sound person and good person." She was then asked: "Was anything said about who Amy White would hold title for?" and her answer was: "For Mrs. Dove." Mrs. Dove's daughter, Adne Hensel, testified that her mother told Rodney White she would like to have the house across the street. Rodney saw Amy White and returned to tell Mrs. Dove it was all right. She could go ahead. Ramona Yost, a daughter, verified this. Another daughter, Myrtle Custer, testified that after investigation Rodney White reported to Mrs. Dove that the house could be bought for a deposit of $25.00 and that "Rodney said he would ask Aunt Amy and see if we could have it put in her name." She was then asked if anything was said about whose house it was to be and in whose name Aunt Amy was to hold title, and she answered: "It was ours. Amy was to hold it until it was paid for."

Testimony from a number of witnesses was produced to show that Mrs. Dove paid the full purchase price. Mrs. Vaughn's testimony was that on two occasions she saw Mrs. Dove give Mr. White the money to make the payments. Her recollection of one occurrence was that Mrs. Dove said: "Here's the money. It's been a struggle." On the other occasion Mrs. Dove in Mrs. Vaughn's presence, gave Mr. White $200.00 which Mrs. Vaughn had lent her. A daughter, Gladys Bennett, testified that she had seen her mother give Mr. White money, and added: "I have seen $25.00 pass every month." Asked what conversation passed between Mr. White and Mrs. Dove on the occasion of the payments, she said that he would say, "Old lady, the house payment's due. You got it?" Myrtle Custer testified that she had been at the door when Uncle Rodney came for money and that he would say the money was for "payments, or for taxes. He even taken the electric bill and paid for us." Rodella Campbell, another daughter, testified that she saw more than one of the $25.00 monthly payments given to Uncle Rodney. Ramona Yost said she had heard Uncle Rodney come in and ask for the house payment and that she had seen her mother give him the money as a payment on the mortgage. Another daughter, Melrose Holifield, said that she herself had taken money to

Uncle Rodney for the house payments. She said her mother handed her a little tan or yellow book in which payments were recorded, with the money in it and that she gave it to Uncle Rodney. She added: "I have even cashed my allotment checks, my first husband was in the Navy, and given the money to mother to pay for the house, many a time."

In 1944 major repairs or capital improvements costing $900.00 were needed. It was testified that at that time the Maryland Roofing Company reshingled and more or less remodeled the house. Gladys Bennett testified that her mother paid for this work. "I saw $300 down payment in front of my eyes. Mother counted it and passed it to Mr. White to make it." She testified further that additional monthly payments of $53.00 and some cents were made and that on occasion she brought money home and gave it to her mother to make these payments. Rodella Campbell testified that she, too, saw her mother give Uncle Rodney $300.00 as the down payment on the remodeling and that she took the money to the post office and got money orders for the monthly payments. Adne Hensel testified as to the repairing generally. She said her mother would tell Uncle Rodney when repairs had to be made and he would go and find a man to do the work, and that he would come and talk about the price. The family did some of the work themselves. Mrs. Dove's son-in-law tore out an indoor archway and a son put a cement covering over the well. She testified that her mother paid for these repairs. "She would give the money to Rodney White. For the shingle job, it was mailed through my little sister down at the post office."

Rodella Campbell and Melrose Holifield both testified as to the payment of the taxes. Rodella Campbell said: "Uncle Rodney used to come in and ask for them. One time I remember he didn't pay it and Mama gave him the devil." Mrs. Dove had given him the money for taxes and he had used it to buy coal. She saw the house advertised for taxes in the paper. The testimony shows that her mother jumped on him and he said: "I will pay it. I had to use it to buy coal." Melrose Holifield verified this incident. She was asked further whether her mother gave Rodney White money for the

taxes and her answer was: "She gave it to me and I took it to him."

There was considerable testimony as to declarations of Rodney White stating the property to be owned by Mrs. Dove. Adne Hensel testified that during the years from the time Mrs. Dove moved into the house and until Rodney White's death, she had often heard him speak of the house as belonging to her mother. In 1950 she asked him " 'What about my mother's home?' and he said, 'Don't worry about your mother's home. Amy White will not treat her dirty.' " She also testified about Rodney White's remarks to Mrs. Dove's grandchildren. " 'If you don't leave Grandmother's water alone I will spank you.' He would say to me, 'They are wasting your mother's well water.' " Lorraine Haske, a niece of Mrs. Dove's, testified that Rodney White said to her, speaking of the grandchildren who lived with Mrs. Dove: "Why don't you make her sell this damn house and get rid of those damn kids and then she can go where she pleases." Mrs. Vaughn said that on one occasion she was at Mrs. Dove's for lunch and Rodney White came in and "I said something about the home and he said, 'well, she's got her home now, and protection for her children' * * *." Rodella Campbell said that Rodney White never spoke of the house as belonging to him. "He always referred to it to me as my mother's home, all the time." In 1953, Myrtle Custer asked Rodney White: " 'Uncle Rodney, when are you going to have the place straightened out so we will know it belongs to mother,' and he said, 'That's all up to your mother'." He told Mrs. Custer that Aunt Amy wouldn't treat their mother dirty. He said, " 'Mert, you know better than that.' " She testified further that Rodney White would get after the grandchildren when they would get on the roof or the cellar door, telling them that their grandmother didn't have the money to fix things up. Gladys Bennett said that he always referred to the house as her mother's house.

There was testimony concerning the final payments on the mortgage. Rodella Campbell testified that she was there when Rodney White came in one night and said: " 'Arie, I want $25.00 from you and this is your last payment', and she says,

'Thank God for that'." Gladys Bennett testified: "I was there when he said the payments were completed. * * * He told her that was the last payment, that finished it off."

The appellees produced Dorsey Darby, who did general repairs and painting and who had worked on the house from 1947 on. He testified that he had made arrangements to do the work with Rodney White and that he had been paid by Rodney White. He would meet Rodney White in Gaithersburg at Marshall Walker's store on Saturday evenings to be paid. Frank B. Severance, chairman of the board of the Citizens Building and Loan Association, testified that Rodney White made the application for the mortgage loan on the house in controversy in 1937 and that he did not discuss the situation with anybody but Mr. White. He testified that in June, 1947, the original $2,000 mortgage, on which there was a balance of $472.42, was paid from the proceeds of a new mortgage for $3,500.00, which was put on the house by Rodney White. It is conceded that both mortgages were executed by Amy White only. To the witness' knowledge, William Rodney White was the only person who paid these mortgages and no other person had made payments on them. He said, in speaking of the payments: "They were brought to me in cash and I took them with the book to the building association." Payments were made at Marshall Walker's store in Gaithersburg. He testified that the payments were $25.00 a month on the first mortgage, and that the payments on the $3,500.00 mortgage were $50.00 a month. He said that the $3,500.00 mortgage was made to give Rodney money to buy a new truck for the carrying on of his coal business. The only other material witness for the appellees was Charles White, a son of Rodney White, who was his administrator. His testimony was that his father and mother were divorced in 1951, after having been separated since 1931. He said that his father kept no checking account until 1953, when he received an inheritance from an uncle. This was just a short time before his death. The son testified that the 1953, 1954 and 1955 taxes on the house in question were paid by him as administrator. He identified a check for $50.00 to the building association dated July 8, 1953, signed by his father. Then he

further testified that he paid off the balance of the $3,500.00 mortgage as administrator after his father's death. He testified also that at the time of the divorce in 1951, the court ordered his father to pay his mother $8.00 a week alimony and that at the time of his death, he was ninety-two weeks in arrears.

The appellees argue that a meretricious relationship existed between Rodney White and Ara Dove and that it was this relationship that caused Rodney White to purchase the house for Mrs. Dove and pay for it himself. In 1944, Rodney White moved his trailer onto the rear of the lot on which the Dove house stood and lived there in the trailer until he died. The uncontradicted testimony was that he had done this at the request of Mrs. Dove's sons who were in the Army and who wished him to be nearby for the protection of their mother and their sisters. Mrs. Dove and her daughters flatly deny that the relationship between Rodney White and Mrs. Dove was other than platonic, but there is some evidence to the contrary. However, there is nothing to show that any such relationship, if it existed, began before the trailer was moved onto the Dove property some seven years after the house had been bought. The record does not paint a picture of a man who could afford to set up an establishment for a paramour and her seven children.

Appellees argue further that Mrs. Dove did not have the money to buy the house and that Rodney did. This is hardly borne out by the record. It was shown that his business was the hauling from the mines and the selling of coal and that it was a purely seasonal business, that he never had a bank account until his uncle's inheritance came to hand, that he borrowed a thousand dollars from one of Mrs. Dove's daughters for the purchase of a truck, that at the time of the divorce, his income was only enough for the court to require the payment of $8.00 a week to his wife and that he never even paid this modest sum. On the other hand, it was shown that Mrs. Dove worked as a practical nurse, that early in the story her sons were in CCC camps and sent home their earnings for the house, that her daughters contributed from time to time, that one of them turned over her Navy allotment checks from her

husband while she was living at home with her mother, and that the Dove family seemed to have regarded the purchase of the house as a joint undertaking and all helped in one way or another and at one time or another. It is conceded that Rodney White was not a landlord and Mrs. Dove a tenant, so that whatever money was paid by her was not paid as rent.

There is no doubt that the arrangement as to the purchase of the house was loose, to say the least. Rodney White undoubtedly treated the house as his to the extent of borrowing the money for his truck in 1947, but it was shown clearly that Mrs. Dove never knew of this and that he took great pains that she should never find out. When the mortgage payments became $50.00 a month, he continued to procure the $25.00 a month from Mrs. Dove as if there had been no change, and added the additional $25.00. When her $25.00 payments added up to $2,000.00 and interest, he told her the house was paid for. Tommy Yost, a son-in-law of Mrs. Dove, testified that at the time Rodney White bought the new Ford truck with the proceeds of the $3,500.00 loan, he had a conversation with him about how he paid for the truck, and Rodney had said to him: " 'I took a mortgage out on your mother-in-law's place to buy this truck. I don't want you to say anything to her about me taking it.' "

The testimony as to Rodney White's dealings with the repairman and the building and loan association is entirely consistent with the testimony for the appellant, that he attended to all affairs in connection with the house for the account of Mrs. Dove and that the money used for the various payments was provided by her. At the taking of testimony, Mrs. Dove produced a number of tax bills, insurance policies, the receipted contract for the reshingling of the house, and other papers which an owner of property would normally have. If the testimony produced on behalf of Mrs. Dove should be given credence, as we think it should, the testimony of the appellees as to the business transactions and the payments made, is not harmful to the appellant's claim of ownership. The testimony as to the payment of taxes and mortgage installments after Rodney White's death would seem to add little to appellees' claim. Since Mrs. Dove had been told that she

could not have the property and that Rodney White's children were to get it, it was unlikely that she would have made any payments, and it was natural that Rodney White's estate would make them, having been assured that they were to receive the property.

Two evidences pointing to the validity of Mrs. Dove's claim to the house impress us as significant. First, after his wife divorced him in 1951, there was no impediment to his taking record title from Amy White if the house was his. He never did so. Mr. Dove, however, was still living and there had been no divorce. Second, after Amy White finally had told Mrs. Dove the house was to be deeded to the Rodney White children, Mrs. Dove, much upset, wrote her a distraught letter begging her to hold title and to let her—Mrs. Dove—have it on some terms, either for life or as purchaser. The letter obviously was unstudied and written from the heart. In it Mrs. Dove says to Amy White that if she will sell it "as reasonable as you can * * * my kids said they will help me *again* to get it as my heart is so set to stay hear." (Emphasis supplied).

We have concluded that Mrs. Dove has met the burden of showing that she was the beneficial owner of the house and that she bought it, paid for it and maintained it. We think that her possession for almost twenty years, payment of principal and interest of the mortgages and the taxes and insurance, and the making of improvements were clearly and unequivocally acts which were done only by reason of the agreement relied on by Mrs. Dove and are evidence that there was such an agreement. The evidence as to the doing of these acts is clear and satisfactory. Mrs. Dove has shown that Amy White held legal title as trustee for her. The decree below will be reversed and the case remanded for the passage of a decree in conformity with this opinion, the appellant to repay the estate of Rodney White the taxes it has paid on the property.

> *Decree reversed, with costs, and case remanded for passage of a decree in conformity with the views herein expressed.*